## TEXOMA NATURAL GAS CO. v. OIL WORKERS INTERNATIONAL UNION, LOCAL NO. 463, et al.

### Civil Action No. 378.

District Court, N. D. Texas, Amarillo Division.

Dec. 28, 1943.

134

Morgan, Culton, Morgan & Britain, of Amarillo, Tex. (by D. H. Culton and B. M. Britain, both of Amarillo, Tex.), and J. J. Hedrick and W. T. Spies, both of Chicago, Ill., for plaintiff.

Lindsay P. Walden, of Fort Worth, Tex., for defendants.

WILSON, District Judge.

This suit is brought under the Declaratory Judgment Act, 28 U.S.C.A. § 400, to obtain a declaration of certain rights and other legal relations of plaintiff (herein called the Company) and a portion of its employees, under a contract entered into between it and Oil Workers International Union, Local No. 463 (herein called the Union) as bargaining agent for all the Company's employees at its compressor station and gasoline plant located at Fritch, Texas, exclusive of supervisory, clerical, laboratory, pipeline and communication employees. Specifically it covers the seniority status of employee R. J. (Ralph) Orr under the seniority provisions of the contract, whether the Company had the right under the contract to change from a 40-hour work week to a 48-hour work week, and whether those questions are appropriate matters for arbitration under the arbitration provisions of the contract. It is conceded that there is a diversity of citizenship, and that the matter in controversy, represented by the value of the rights involved, exceeds, exclusive of interest and costs, the sum of three thousand dollars.

I. Situation of the Parties.

Plaintiff is engaged in the production of gas in the Panhandle of Texas. It transports this gas to one of its two compressor plants (one plant being located at Fritch in Hutchinson County, Texas, and the other in Moore County, Texas) where the waer and liquid hydrocarbons are removed and the residue increased to such pressure as will carry it to a point in Oklahoma where plaintiff makes delivery to Natural Gas Pipeline Company, which company transports such gas to markets near Chicago and intermediate points. In the transportation of the gas, it becomes necessary from time to time again to "boost" the pressure, and for this purpose Natural Gas Pipeline Company operates ten compressor stations at convenient points.

Plaintiff and Natural Gas Pipeline Company are affiliated corporations with unified management at the principal office in Chicago, Illinois. W. H. Davidson, of the Chicago Office, is Superintendent of Compressor Stations of both companies. His immediate subordinate at the Fritch Station is G. W. Gibbs whose assistant is H. R. Rohwedder. J. G. Dickinson, of Amarillo, Texas, is plaintiff's Superintendent of Production, and represented plaintiff in the negotiations which preceded the execution of the contract hereinafter referred to.

Defendant Oil Workers International Union, Local No. 463, is an association, commonly called a Labor Union, which, as a result of a vote of the Company's employees in the selected group, held under supervision of the National Labor Relations Board, was designated as exclusive bargaining agent for all the Company's employees at its compressor station and gasoline plant at Fritch, Texas, exclusive of supervisory, clerical, laboratory, pipeline and communications employees, for the purpose of collective bargaining with the Company with respect to wages, hours, and other conditions of employment, subject to and in accordance with the provisions of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. The employees included comprise, among others, those holding jobs as main engineers, auxiliary engineers and oilers at the compressor plant.

R. D. Moore, V. H. Noland and A. N. Bantz are employees of the Company, selected by the employees covered by the contract hereinafter referred to, as a Workmen's Committee to represent them in meetings with the management "for the discussion of complaints and controversies and the adjusting of grievances and disputes of employees." Said Moore has been a member of the Committee since its first organization upon the execution of the contract, and is its chairman.

## II. Execution of the Contract.

After lengthy bargaining and negotiations between the Union, as such bargaining agent for such employees, and the Company, a contract in writing dealing with wages, hours of work and other conditions of employment of such employees was entered into on August 27, 1942. It provided:

"This agreement shall become effective on the first day of September, 1942. It shall remain in effect from year to year thereafter until terminated by written notice given by either party to the other at least thirty (30) days prior to the termination of any such period."

## III. Issues Involved.

In the complaint plaintiff seeks a determination as to (1) whether the Company can be required to remove from the seniority list, and from his job as a main engineer, employee R. J. Orr, and disregard the seniority status of that employee appearing on a seniority list prepared and posted in accordance with the contract, (2) whether the Company had the right, without first obtaining from the Union a supplemental contract so providing, to change from a 40-hour week to a 48-hour week, (3) whether either the seniority status or the right to change the length of workweek is, under the contract, arbitrable, and (4) whether a purported arbitration award is invalid either (a) because, over the Company's objection, the arbitrators sought to arbitrate matters not arbitrable but fully covered by the contract, (b) because in attempting to provide a "remedy" the arbitrators undertook to exercise powers beyond those vested in them as arbitrators, or (c) because of the alleged disqualification of one of the arbitrators. Defendants in their answer challenged plaintiff's position on each of these matters, and, in addition, insisted (1) that the dispute is cognizable only by the National War Labor Board, and (2) that the contract has terminated, and all questions raised have become moot (recognizing in that connection that if the contract has terminated, the purported award of the arbitrators was not effective).

At the conclusion of the hearing, I announced that I recognized the necessity for an early determination of the questions raised, and orally held (1) that the Company properly recognized the seniority status of employee Orr as it appeared on the seniority list prepared under the provisions of the contract, (2) that the Company had the right to change from a 40-hour week to a 48-hour week without first negotiating a supplemental contract with the Union, (3) that neither the seniority of Orr nor the right to determine the length of the work week is arbitrable under the arbitration provisions of the contract, (4) that the purported award of the arbitrators is void because of the non-arbitrable nature of the questions involved, and because the relief which the majority of the arbitrators sought to grant was beyond their power to grant, (5) that this Court's jurisdiction is not limited by the provisions of the President's Executive Order creating the National War Labor Board or the regulations thereunder, and (6) that the contract between the parties is still in full force and effect. In view of the dismissal by plaintiff (upon announcement of those holdings) of that portion of the complaint dealing with the alleged disqualification of one of the arbitrators, no holding was made on that point.

At the time my rulings were orally announced, I stated I would later file an opinion expressing my views in more detail. This memorandum is filed for that purpose. Statements of fact herein are intended as findings of fact, and statements of legal conclusions as rulings of law, in accordance with Rule 52 of Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. If further findings and conclusions are desired by counsel, the Court requests suggestions as to any omissions.

## IV. Propriety of a Declaratory Judgment.

■ It is clear that an action for a declaratory judgment is an appropriate procedure for determining the issues herein involved. The statute, 28 U.S.C.A. § 400, provides that:

"In cases of actual controversy * * * the courts of the United States shall have

power upon * * * complaint * * * to declare rights and other legal relations of any interested party petitioning for such declaration, whether or not further relief is or could be prayed, and such declaration shall have the force and effect of a final judgment or decree and be reviewable as such."

Here we have a dispute between parties who face each other in an adversary proceeding. The dispute relates to legal rights and liabilities arising from their contract. The dispute is definite and concrete, not hypothetical or abstract. Prior to the suit, the parties had taken adverse positions with respect to their respective rights and obligations under the contract. There is, therefore, a justiciable controversy appropriate for judicial determination under the Declaratory Judgment Act. Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 242, 57 S.Ct. 461, 81 L.Ed. 617, 622, 108 A.L.R. 1000.

■ The Act is liberally construed so as to expedite and simplify the ascertainment of uncertain or disputed rights. Mississippi Power & Light Co. v. City of Jackson, 5 Cir., 116 F.2d 924, certiorari denied, 312 U.S. 698, 61 S.Ct. 741, 85 L.Ed. 1133. It has been held to furnish an appropriate procedure for an action to determine rights of parties under a contract to furnish gas, Mississippi Power & Light Co. v. City of Jackson, supra; an action to determine the validity of an act of Congress, Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441; an action to determine rights under insurance policies, Standard Accident Insurance Co. v. Meadows, 5 Cir., 125 F.2d 422; an action to determine whether a claimant actually owned an easement which it claimed, Rex Co. v. International Harvester Co., 5 Cir., 107 F.2d 767; an action to determine which of two groups of employees had the right, under a contract with a railroad, to perform work on certain sections of the road, Gaskill v. Thomson, 8 Cir., 119 F.2d 105; an action to determine rights under the Wage and Hour Law, A. H. Belo Corp. v. Street, D.C.N.D., Tex., 35 F.Supp. 430, affirmed Walling v. A. H. Belo Corp., 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716. The procedure is useful in determining the rights of the parties under an arbitration agreement (even though there be some other remedy), Lehigh Coal & Nav. Co. v. Central Railroad, D.C.E.D. Pa., 33 F.Supp. 362, or in ascertaining the seniority rights of employees under a contract between them and a railroad, and this notwithstanding the provision for an adjustment board in the Railway Labor Act, 45 U.S.C.A. § 151 et seq., Adams v. New York, Chicago & St. Louis Railroad Co., 7 Cir., 121 F.2d 808.

The varied types of controversies where the remedy is recognized to be an appropriate and efficient one merely apply the intent of Congress, evident on the face of the Act itself, that it be applicable to *all* cases of actual controversy (except with respect to Federal taxes.) There is certainly here such a controversy as authorizes the application of the Declaratory Judgment Act. Rule 57 specifically provides that the existence of another remedy does not preclude a judgment for declaratory relief in cases where it is appropriate.

## V. The Issue as to Jurisdiction of the War Labor Board.

By motion to dismiss presented prior to filing answer, by pleas to the jurisdiction presented prior to the trial, and by motion to dismiss urged at the conclusion of the evidence, defendants point to the existence of the National War Labor Board created by the President under Executive Order 9017, dated January 12, 1942, 50 U.S.C.A. Appendix § 1507 note which order, among other things, provides that "the Board shall finally determine labor disputes which might interrupt work which contributes to the effective prosecution of the war," and challenge this Court's jurisdiction to determine the issues raised.

■ It is obviously not necessary for this Court here to attempt to determine the orbit of that Board's jurisdiction. It has entered no directive requiring that the Company accept and comply with the award of the arbitrators (which, as hereinafter shown, I find to be void and of no effect). No appeal lay from the purported award to that Board. In its directive requiring that the parties proceed under the arbitration provisions of the contract it made no attempt to reserve jurisdiction, by way of appeal, over the award. Defendants by themselves filing before the War Labor Board, subsequent to the institution of this suit, a petition seeking an enforcement of the award could not thereby deprive this Court of jurisdiction to determine questions raised in a suit already properly pending in this Court.

■ It is not necessary here to determine what the rights of the parties would

be if the War Labor Board had, in fact, assumed jurisdiction over the validity of the award, and had issued a directive requiring compliance therewith. No such action has been taken by the Board. It appears from Exhibit D 2 that the only action taken by the Board on defendants' petition for enforcement of the award has been to refer it to its legal division. This does not constitute assertion of jurisdiction to determine the validity of the award, or to require compliance therewith.

Irrespective of what the Board's power under the Executive Order may be, defendants in their contention that the Board has exclusive jurisdiction to determine the validity of an arbitration award assume that the Board in the exercise of its appropriate functions will disregard interpretations of contracts and determinations of the validity of arbitration awards by courts of competent jurisdiction. But the Board itself has evidenced no such attitude. To the contrary it has made plain its policy to recognize such interpretations and determinations, and has announced that in all cases where it issues a directive for enforcement of an award or any part thereof, such directive shall be effective only until a court of competent jurisdiction shall announce views contrary to those of the Board.

In its Release No. B–970 of the War Labor Board issued on September 10, 1943, under the heading "Enforcement of Arbitration Awards," its definite policy on this point is clearly set forth in the following language:

"The Board's determination of the matter will constitute a final adjudication unless and until a tribunal of competent jurisdiction issues rulings contrary to those of the Board. *The action of the Board in no way prejudices the right of a party to appeal to a court of competent jurisdiction for a judicial declaration of the rights and obligations flowing from the award. The Board's order will be made expressly subject to discontinuance should a court render a decision contrary to the conclusions of the Board."*

Even prior to that release, the Board had evidenced such a policy when entering its order in the case of Smith & Wesson, covered by the Board's Release No. B-843, dated August 1, 1943. There the Board disapproved certain provisions of the award of an arbitrator, but approved other provisions which it said it expected the parties fully to comply with *until such time as a court of competent jurisdiction issues rulings contrary to those of the National War Labor Board.*

This attitude of the Board was even earlier reflected in its opinion in the Acme Evans Milling Co. Case covered by the Board's Release No. B–400, dated January 18, 1943, where it was said that the Union was wrong in its contention that companies can appropriately be required to forego their right of appeal in the courts, that to comply with this contention of the Union would cut off the company's right of appeal; that it would not be fair to take such action where the company has substantial as well as technical rights at stake.

These evidences of the Board's attitude were cited by plaintiff's counsel during argument, and defendants have referred me to no holding of the Board to the contrary. I must, therefore, assume that they reflect the Board's considered policy, and that even if it had issued a directive (which it has not) requiring that the award of the arbitrators be complied with, that directive would have specially provided that it would be effective only until a court of competent jurisdiction should issue rulings contrary to that of the Board.

Since no such order has been issued by the Board, it is not necessary here to determine whether if such an order had been entered, and not made subject to be controlled by subsequent rulings of a court of competent jurisdiction, it would be valid.

The opinion of Judge Coleman of the District Court of Maryland in Baltimore Transit Company v. Flynn, 50 F.Supp. 382, 387, is cited by defendants in support of their contention. That case, however, was one entirely different from this. There the Board *had actually issued an order* directing that the company do certain things, which included compliance with an award of an arbitrator. The action was between the company as plaintiff, and the United States Attorney and an employee of the Office of Defense Transportation as defendants. The action was not to determine the rights of the parties under their contract, or the validity of the arbitration award under the contract. It was for the purpose of obtaining a declaratory judgment that the Board's directive was void. The Court's holding was that defendants in that case having filed an answer denying any authority or intention to enforce

the directive, there was no case on which relief could be granted, and there was no controversy between the parties to that suit on which a declaratory judgment could be entered.

However, in that opinion, Judge Coleman expressed views as to the powers of the National War Labor Board which, if well founded, conclusively demonstrate the unsoundness of defendants' contention here. He held that the powers of that Board are advisory only; that it has no power to create or determine legal liability. He said:

"It does not exist as a tribunal to determine the legal rights and obligations of employer and employe, or to protect and enforce such rights, but merely to decide how such rights, in the Board's opinion, are to be exercised in the public interest in view of the state of war. * * * The function of the Board is to give expression of its views of the moral obligation of each side to the controversy, as members of society, to agree upon a basis for cooperation in the public interest. The jurisdiction and power of the Board to direct parties to do what it deems they should do in such interest is not limited by their constitutional or legal right to refuse to do it. There is no constraint upon the parties to do what the Board may decide they should do, except moral constraint."

Again:

"The state of war has not destroyed nor suspended the right to judicial determination of constitutional rights."

■ But it is not necessary for me to determine whether Judge Coleman has in that opinion properly outlined the function and powers of the National War Labor Board. It has issued no directive requiring an acceptance of the award of the Board of Arbitrators, it has clearly established a policy of providing in such directives as it does issue that same will remain in effect only until a court of competent jurisdiction shall express views different from those of the Board. Plaintiffs are not here attacking any directive issued by the Board. Defendants' contention that the National War Labor Board and its Regional Boards have exclusive jurisdiction of the questions involved in the complaint is not well founded, and the motion to dismiss and plea in abatement based on that contention must be overruled.

## VI. Whether the Contract has Terminated.

When the motion to dismiss was argued on November 24, 1943, no contention was made that the contract had terminated. When defendants' answer was filed, however, within a day or two thereafter, they incorporated therein a claim that the contract terminated on August 31, 1943, and they now insist that all questions raised by the complaint have become moot. On oral argument they admitted that if the contract had so terminated, the arbitration must fall since it purported to be founded on the contract.

Defendants' contention on this point is wholly without support in the evidence. There is no evidence whatever to sustain it. Every circumstance and all the evidence conclusively shows that the contract is still in full force and effect, and that the parties have at all times so recognized. Defendants' contention that the contract has terminated is based on matters set forth in correspondence between a representative of the Union and an executive of the Company shortly prior to and shortly subsequent to September 1, 1943. That correspondence, however, instead of supporting defendants' contention conclusively establishes the contrary.

The contract between the parties provides:

"This agreement shall become effective upon the 1st day of September, 1942. It shall remain in effect from year to year thereafter until terminated by written notice given by either party to the other at least thirty (30) days prior to the termination of any such period."

Such a provision for automatic renewal of a contract for a stated period is not unusual. It is frequently found in contracts between landlord and tenant. Sometimes there is a provision that a contract is renewable for a stated period upon the giving by one to the other of a certain notice. Whether the contract is automatically renewable in the absence of notice, or is renewable upon the giving of notice, the result is the same.

■ Here the contract provides that it *shall* remain in effect from year to year *until terminated* by written notice, and that such notice must be given *at least thirty days* prior to the termination of any such yearly period. Obviously, such a notice must be

clear and explicit. The testimony conclusively shows that no such notice was given.

On July 30, 1943, Witness Poe, as Secretary of the Union, wrote Mr. Dickinson, Production Superintendent of the Company, as follows:

"This is to advise you that we desire to meet with your Company on Monday, September 6, 1943, at 10:00 A. M., to negotiate *amendments* to the present collective bargaining contract now in effect between Texoma Natural Gas Company and Oil Workers International Union.

"You will please contact the chairman of the workmen's committee and arrange a suitable place for those meetings to be conducted."

Obviously, this letter could not reasonably be construed to be a notice of termination. In order, however, to arrive at a definite understanding on the point, Mr. Dickinson, on August 4, 1943, wrote Mr. Poe, acknowledging receipt of his letter of July 30th, and saying:

"Will you please advise whether such letter is intended as a notice of termination of the contract between the Union and the Company in accordance with Section 1, Article I, of the collective bargaining agreement?"

In replying to this letter on August 20, 1943, Mr. Poe said:

"I wish to say that we did not intend to cancel the entire agreement but do wish to make certain *amendments* to the contract for the *purpose of clarification*. I have not read the amendments that the Employees have prepared therefore I am not now in a position to state these amendments.

"If you do not desire to *go into negotiations* to make such amendments without terminating the present agreement, we shall then naturally ask to terminate the present agreement and proceed to negotiate another one. However, until such time you are notified to this effect the present agreement shall be in full force and effect."

In reply to that letter, Mr. Dickinson on August 24th said:

"This will acknowledge receipt of your letter of August 20, 1943, advising that it was not the intention by your letter of July 30, 1943, to cancel the agreement between this company and the union, but that the union simply wishes to make certain amendments for the purpose of clarification. We

therefore consider the agreement, as now written, binding on both parties until September 1, 1944; however, the company is agreeable to meeting with representatives of the union September 6, 1943, for the purpose of considering clarifying amendments to the agreement.

"The company may have certain suggestions to offer for clarifying the agreement which it may propose at the time of the meeting of the representatives of the union and the company on September 6."

There is here evidenced no notice of termination of the existing contract. On the contrary, the Union expressly disavowed any such construction, and specifically stated that "until such time (as) you are notified to this effect the present agreement shall be in full force and effect."

Counsel for defendants in oral argument unduly stressed the language in Mr. Poe's letter of August 20th "If you do not desire to *go into negotiations* to make such amendments without terminating the present agreement, we shall *then* ask to terminate the present agreement and proceed to negotiate another one," and interpreted that phrase as if it were a *conditional* notice of termination, insisting that it meant that the option to terminate was thereby given if the Company did not, *in advance, agree* to the amendments, *the content of which was then not even known to Mr. Poe.*

The language cannot be given that interpretation. It constituted nothing more than a statement of an intention to give such a notice in the future in the event the Company, in the absence of such a notice, was unwilling to "negotiate" as to the proposed amendments (not, as counsel for defendants urge, if the Company was unwilling without knowing what the proposed amendments were, to, in advance, agree thereto).

The evidence conclusively shows that none of the parties considered that letter as a notice of termination, conditional or otherwise. Mr. Dickinson, in his reply of August 24, 1943, stated that he considered the agreement as then written binding on both parties until September 1, 1944; that the Company was agreeable to meeting with the representatives of the Union on September 6, 1943, for the purpose of considering clarifying amendments to the agreement; and that the Company itself might have certain suggestions for clarification of the

agreement at the meeting on September 6th. At the suggestion of the Union this meeting was postponed to September 13th, when negotiations were commenced. I understand from the evidence that these negotiations are still in progress.

Since September 1, 1943, all parties have proceeded on the assumption that the contract was in full force and effect. The witness Moore, Chairman of the Workmen's Committee, testified on December 6, 1943, that he then thought the contract had terminated, but that he had never been authorized by the membership of the Union to terminate it. His testimony given on December 8, 1943, shows that in expressing the view that the contract had terminated he was merely accepting the legal conclusion of counsel for the Union.

Mr. Poe, Secretary of the Union, testified on the first day of the trial that he considered the contract in effect, but on the third day he testified that after talking with Union counsel, and a representative of the International Union, he had reached the conclusion that the contract had terminated.

This witness had on October 20, 1943, signed an award purporting to determine the rights of the parties under an agreement which he now says was not at that time in effect. Among other things, he, in that award, attempted to order the Company to abide by the terms of the collective bargaining agreement in its *future* dealings with its employees. Yet he now expresses the view that the contract with which he ordered compliance had then terminated.

The contention that the contract had terminated on August 31, 1943, is an afterthought. The parties were using the machinery claimed by the Union to be provided for in the contract when they appeared before the arbitrators on October 11, 1943. All parties recognized the contract to be in force when argument was presented to me on defendants' motion to dismiss.

■ Whether the contract has terminated is not determined by the opinions of the parties. It is determined by whether either of the parties has, as provided by the contract, exercised a right to terminate it. The notice of termination must be clear, explicit and presently effective, not a statement of an intention to act in the future. Star-Chronicle Pub. Co. v. United Press Ass'n, 8 Cir., 204 F. 217, 223. I hold that no such right has been exercised. There is no such thing as a partial termination. The contract is either in full force or it has completely terminated. The Union cannot hold to the maintenance of membership and other acceptable provisions of the contract and terminate unsatisfactory provisions. 17 C.J.S., Contracts, § 403.

■ Even if Poe's letter could be construed as a notice of termination, I doubt its legal effectiveness as such since there was nothing to show that he had been authorized by the Union to exercise the option. The Chairman of the Workmen's Committee testified that he had not been so authorized. Mr. Poe himself did not even know the nature of the amendments to the contract which the members of the Workmen's Committee desired. Under such circumstances, I think no termination of the contract by the Secretary of the Union would be binding on the other party unless he be shown fully authorized by the Union to declare the contract to be at an end.

## VII. The Seniority Status of Employee Orr.

■ Prior to the contract effective September 1, 1942, the Company in promoting and demoting its employees gave recognition both to seniority on the job and to ability; and where the ability was the same, promotions and demotions were in order of job seniority. A substantial change in this policy was required by the provisions of the contract effective September 1, 1942, and the resulting effect of the required change on some of the employees has brought about one of the two primary differences in construction of the contract as to which a declaratory judgment is sought. That dispute relates to the seniority status of employee R. J. Orr, and whether that status is, under the facts, arbitrable.

Upon the expansion of many war industries served natural gas through the facilities of Texoma and Natural Gas Pipeline Company, it became necessary to enlarge the facilities of Texoma in order that it might produce and transport much larger volumes of gas. It therefore commenced construction of a new compressor station (known as No. 22) in Moore County, Texas, and placed its Construction Superintendent Dison (who had been stationed at Fritch) in charge of inspection of that construction. In March, 1942, it became necessary to carry on certain seasonal construction operations, repairs, etc., at the

Fritch plant, and because of Dison's absence at the Moore County plant it became necessary to have a temporary supervisor to supervise this construction.

R. J. Orr was an old employee of the Company. He had been a member of the test crew when the line was first constructed in 1931. He was then out of the Company's employment for a time, and returned as an Auxiliary Engineer on July 30, 1934. On April 1, 1936, he was promoted to the classification of Main Engineer, and had been continuously employed in one of those classifications since he returned to the Company in 1934. In addition to his qualifications as an engineer, Orr had had sufficient experience in construction work to qualify him to perform the duties of supervising the construction work required at the Fritch plant during Dison's absence. He was assigned by the Company to those duties and accepted the assignment. He was not, however, given a raise in pay to that of Supervisor; his compensation remained that of Main Engineer. The notation made on his payroll card was "To supervise const. jobs while Dison's at Sta. #22 temporarily. Title change only." The change was effective April 16, 1942.

At the time the change was made, it was explained to Orr that while there was a slight possibility that the work would result in a permanent advancement the appointment made was a temporary one only; that the job might last a few weeks or might last six months, but that when the work was ended he would be returned to his regular job as engineer. He accepted the assignment with that understanding.

The temporary assignment of Orr to duties of supervising construction work resulted under the Company's then existing seniority policies in temporarily advancing employee Dellis from the classification of Auxiliary Engineer to that of Main Engineer and temporarily advancing employee Lewis from the classification of Oiler to that of Auxiliary Engineer. It was explained to both that their advancements were temporary, and that upon Orr's return to his regular job, they would automatically go back to their former classifications.

Subsequent to this arrangement, the contract was entered into, effective September 1, 1942, between the Company and the employees of the selected group. In that contract it was provided that company seniority should be determined by the length of service with the Company, effective after four months of continuous service or upon assignment within a shorter period to a regular job classification; and that departmental seniority should be determined by the length of service in the gasoline or compressor station departments, and start "when the employee first enters a regular job classification in one of said departments." Job classifications provided for in the compressor station included welder, machinists, electrician, metallizer, main engineers, auxiliary engineers, oilers and repairmen.

The numerous provisions of Article III, of the contract, dealing with seniority, show the importance of this section of the contract to each individual employee. Section 2 provides that promotions, demotions, layoffs and re-employment shall be made upon the basis of seniority and ability; that when deemed necessary to deviate from seniority it may be made the subject of a conference between the Workmen's Committee and the Management, but that the decision of the Management shall be final. Section 3 provides for retention of seniority status of an employee laid off through no fault of his own or unable to work due to sickness or injury. Section 4 requires the forfeiture of all seniority rights where an employee terminates his employment through his own desire or is discharged by the Company for cause. Section 5 stipulates that where there is a forced reduction in either department, departmental seniority will apply but if an employee is required to leave a department due to a forced reduction, company seniority will apply. Section 6 provides that when additional help is required for a period of two weeks or more the job shall be tendered to former employees with seniority rights and that "the last man with seniority rating laid off shall be the first man called back."

It is readily seen that the seniority rights of each individual employee are under this contract of the highest value to him. Much of the contract relates to procedural matters but those provisions dealing with seniority are in the nature of employee guarantees and relate to substantive rights. You might say they are appurtenances and are in the nature of property rights to the individual employee, like owning a

142

horse or a house. The matter of an employee's seniority rights is of vital and paramount concern to him. That was recognized by the parties in preparing the contract. There are more protection provisions touching the rights of an employee's seniority than of all other employee rights put together. In fact, they might be termed the gist of the contract, the real substance of the contract. Those rights of each employee must at all times be kept in mind in determining the meaning of the various contractual provisions.

Since the seniority provisions of the contract constituted a departure in some respects from the Company's former seniority policy, it became necessary to provide in the contract for a basic seniority list. This was accomplished by Sections 7 and 8 of Article III of the contract which are as follows:

"7. The Company shall compile a seniority list from its payroll records and such list shall be posted on the bulletin board at the Fritch plant for a period of fifteen (15) days following the date of this Agreement. Any protest as to the seniority list must be made within fifteen (15) days from date of posting or the list will stand as correct.

"The seniority list as posted shall not be the occasion for making any change in the jobs now held by the employees affected by this Agreement. The Company will keep an accurate list of all employees affected by this Agreement which shall be available to the Workmen's Committee and to any employee at all reasonable times.

"8. The seniority rights of any employee who is advanced to a supervisory position shall continue both as to plant and department."

In an effort to comply with Section 7, the Company on September 8, 1942, prepared from its payroll records a seniority list which it tendered to the Workmen's Committee. On that list, employee Orr's name appeared at seniority position No. 2. The Committee interposed no objection to Orr's name appearing on the list, but did object to the list as a whole on the ground that it had been prepared on the basis of job seniority rather than departmental seniority. The Company recognized this criticism to be justified (evidently because Section 5 of Article III provides that when there is a forced reduction departmental

seniority will apply.) Thereupon *the Workmen's Committee itself* prepared a list based on departmental seniority and presented it to the Company on September 12, 1942. *On that list Orr appeared at seniority position No. 6.* It is conceded that had Orr remained in the engine room and not accepted his temporary assignment to supervisory duties in connection with temporary construction work, his proper seniority position would be No. 2 on the basis of job seniority and No. 6 on the basis of departmental seniority.

The list, as prepared by the Workmen's Committee, was copied by the Company and posted on the bulletin board on September 12, 1942. On September 21st, it was revised to correct seniority rating of certain recent employees and certain recent transfers to the department (having no relation to any of the parties involved here); and the revised list was taken from the bulletin board on September 29th by the Chairman of the Workmen's Committee and delivered to Mr. Gibbs, the Station Superintendent, with the observation that it was correct except as to a six day error in company seniority on two men, as to which he had noted the correct dates. Mr. Gibbs testified that he immediately endorsed thereon the words "Approved by Workmen's Committee and returned to me Sept. 29, 1942. G.W.G." and that he had consistently followed that list in his assignments.

The defendants now contend that Orr's name did not belong on the list at all; that either the Company must keep him permanently in a supervisory job, or if not, and Orr expects to continue to work for the Company, that he must be "kicked back" into the yard crew (the beginners' classification) at a loss in salary (amounting, as stated in argument, to $90 per month) and again work himself up from the bottom of the ladder with every employee in the entire department having seniority over him. *And this, notwithstanding the fact that he had satisfactorily performed the duties of engineer for more than eight years.*

Certainly this was not the intention of the parties when the contract was executed, and the contract is subject to no such interpretation. On the contrary, I think Orr's seniority rights are fully preserved in the contract just the same as if he had actually been working at his

regular job as Main Engineer on the day the contract became effective.

It must be borne in mind that Orr's supervisory duties were known by all parties to be of a temporary nature; that his regular job with the Company was that of Main Engineer. Section 8 of Article III specially provides that:

"The seniority rights of *any employee who is advanced to a supervisory position* shall continue both as to plant and department."

If there were any doubt as to Orr's status in the absence of this provision of the contract, that doubt should certainly disappear when it is considered. What could that mean except exactly what it says? Obviously he was at that time advanced (temporarily) to a supervisory position. Substitute the name "R. J. Orr" for the words "any employee" and the clause reads:

"The seniority rights of R. J. Orr who is advanced to a supervisory position shall continue both as to plant and department."

But defendants insist that the word "is" does not mean "is"; that it means only "may in the future be". Thus they seek a maintenance of seniority rights to those, now junior in service to Orr, who may hereafter be advanced to a supervisory position, but deny those rights to Orr. The defendants' contention cannot reasonably be sustained. The clause is adequate to protect the seniority rights of those at that time temporarily advanced to a supervisory position and also the rights of those subsequently so advanced just as if the parties had used the words "who is now or may hereafter be."

The evidence showed that on October 12, 1942, the Superintendent informed the Workmen's Committee that Orr would be returned to his regular job as Main Engineer, and that under the operation of the contract this would result in a demotion of employee Sampson (then a member of the Workmen's Committee) from Main Engineer to Auxiliary Engineer, and a demotion of employee Thompson from Auxiliary Engineer to Oiler. The Committee did not at that time protest the right of the Company to return Orr to his regular job, but did insist that since employees Dellis and Lewis had been temporarily promoted at the time Orr was assigned to his temporary duties, they rather that Sampson and Thompson should re-

ceive the necessary demotions. The Company's Superintendent agreed that Dellis and Lewis should be the ones to receive the demotions and pointed out that while this would have been the result if the seniority list had been prepared on the basis of job seniority, the list had not been prepared on that basis, but on the basis of departmental seniority, and on that basis, Dellis and Lewis had seniority over Sampson and Thompson respectively. After several discussions the Company agreed that if the Union voted to change seniority from departmental to job seniority it would amend the contract accordingly.

On October 15th the Committee reported that the Union had voted to make no change in seniority provisions; and then, for the first time, the Committee protested Orr's name being on the list at all.

The record justifies the conclusion that Orr was the innocent bystander in the controversy among the employees as to whether Sampson and Thompson or Dellis and Lewis should receive the demotions resulting from Orr's resumption of his regular duties, and that this controversy would never have arisen had the seniority list been based on job seniority rather than on departmental seniority. Unquestionably Sampson and Thompson were "pinched" but that pinch resulted from the necessary and inevitable operation of the contract and the seniority requirements thereof, not from any improper act of the Company under the contract. The evidence justifies the inference that some one had the idea that by sacrificing Orr both factions, Sampson and Thompson on the one side, and Dellis and Lewis on the other, could be made happy. But this cannot be done. Orr, as well as Sampson, Thompson, Dellis and Lewis, has rights under the contract, and those rights must be respected.

The Union is clearly wrong. It has clearly made a mistake in this matter. It cannot get anywhere by taking such positions. I say this, too, with all respect to the Union because I believe I have been their staunch friend from my earliest manhood. But there is a right and a wrong here and, under the facts and the law, they stand out too plainly for controversy.

In my judgment the record presents no issue of fact, and no legitimate issue as to the construction of the contract. Under the unambiguous provisions of the contract, Orr's seniority is number six, where the Union first duly fixed it, with the

Company's acquiescence and acceptance. Had the parties not done so, the Court would be compelled to fix his seniority at number six, under the plain and unambiguous words of the contract. All of its provisions affecting that subject bear no other construction than the construction first adopted by the parties themselves.

I, therefore, hold that the status of employee Orr is properly at position No. 6 on the seniority list prepared in accordance with the contract, and that the Company has not violated the contract in according him that seniority.

It is pertinent to observe that even if, as claimed by the Union, the return of Orr to his regular position constituted a demotion out of the regular order of seniority (which it did not), the Company's judgment in that regard is final under the specific provisions of Section 2 of Article III of the contract.

VIII. The Adoption of a 48-Hour Week.

For some time prior to the execution of the contract effective September 1, 1942, the Company employees had worked 40 hours each week. During September, 1942, it clearly appeared to the Management that the shortage in manpower was such that it would soon become necessary to adopt a 48-hour week, and the Workmen's Committee was so informed. The change was effective as to most of the employees at Fritch by October 25, 1942. While one result of the change in number of hours worked was a change in classification as to some of the employees, and, therefore, the hourly rate of pay as to some was lowered, no employee lost his job as a result thereof, nor was there any employee whose monthly pay was less than it would have been had the Company continued on a 40-hour week. The Company has paid all employees time and one-half for all hours worked in excess of forty in any one week, and the cost to the company for the same amount of work is, therefore, substantially more than it would have been if manpower were available to permit it to operate on a 40-hour week, since it is required to pay 30 per cent more money for 20 per cent more work.

Defendants contend that this change in work week constituted a violation of the terms of the contract, and that the Company had no right to make such a change without first negotiating with the Union

an amendment to the contract so providing. The Company contends that a determination of the length of the work week is a managerial function vested in it under the terms of the contract, and I so hold.

During the negotiations which culminated in the contract, the Union requested the incorporation therein of a provision which, if it had been agreed to, would have supported defendants' contention here made. That provision consisted of the following:

"Article IV. Hours of Work.

"(1) Hours of work shall not exceed forty (40) hours in any one week, or eight (8) hours in any one day, or sixteen (16) in any two consecutive days.

"(2) Time and one-half will be paid for all over eight (8) hours worked in any one day, or over forty (40) hours in any one week."

That suggested provision, however, was rejected by the Company, and nothing whatever was said in the contract concerning hours of work except what is contained in Article IV, under heading "Hours of Work" which is as follows:

"Article IV. Hours of Work.

"1. Time and one-half will be paid for all hours worked in excess of forty (40) hours in any one (1) week.

"2. An employee called back to perform work at the Fritch plant after regular working hours will receive a minimum of four (4) hours pay at his prevailing wage rate.

"3. An employee reporting for work on his regular schedule but not used, will be paid for four (4) hours time at his prevailing wage rate, unless he received notice prior to reporting."

The provision in Section 1 that time and one-half will be paid for all hours worked in excess of forty hours in any one week certainly contemplates the possibility that employees will be required to work more than forty hours per week; otherwise, there was no occasion to provide for time and one-half for hours worked over forty. The right to require such further work is clearly vested in the Company Management under the provisions of Article XV of the contract which is as follows:

"Article XV. Management.

"The management of the Company and the direction of the working forces, in-

cluding the right to plan, direct and control the Company operations, the right to hire, lay off, discharge, promote, demote, or transfer its employees for just cause, the right to introduce new and improved methods or facilities, and the right to make such rules relating to operations as the Company shall deem advisable, are vested exclusively in the Company, subject to the provisions of this Agreement, so long as such rights are not exercised for the purpose of discriminating against an employee because of his membership in the Union."

This provision dealing with the functions of management, considered in connection with the provision for overtime pay, unquestionably gives the Company the right to determine the length of the work week, subject only to the requirement that time and one-half be paid for all hours worked in excess of 40 in any one week.

Even if doubt existed on the point, that doubt would disappear upon giving consideration to the negotiations which preceded the execution of the contract. The Union requested the inclusion of a contractual provision limiting the length of the work week. The Company rejected that provision. The evidence shows that the Company then informed the Union that the shortage in manpower was already being felt and that in all probability it would soon be necessary to adopt a longer work week. Schedules showing the monthly pay each employee would receive, based on both a 44-hour week and a 48-hour week were exhibited to the representatives of the Union who were carrying on negotiations on its behalf.

If there were any doubt otherwise as to the proper interpretation of the contract, these circumstances and the refusal of the Company to accept the clauses suggested by the Union would be of great value in determining the intent of the parties. Refusal to adopt suggested amendments is held to be of significance even when interpreting doubtful provisions of a statute. Manhattan Properties v. Irving Trust Co., 291 U.S. 320, 335, 54 S.Ct. 385, 78 L.Ed. 824, 833.

In support of their contention, defendants assert that since the adoption of the 48-hour week resulted in demotions in job classification of some of the employees, the Company had no right to adopt a policy which would result in such demotions except with the consent of the Union. They assert that demotions cannot be made except on approval of the Workmen's Committee, but there is absolutely nothing in the contract to support that contention. Article XV provides that:

"The right to promote, demote * * * are vested exclusively in the Company, subject to the provisions of this Agreement, so long as such rights are not exercised for the purpose of discriminating against an employee because of his membership in the Union."

It is not contended that the resulting demotions were brought about for the purpose of discriminating against any employee because of his Union membership, and defendants' contention must be tested by other provisions of the contract. What limitations does the contract impose on the Company's broad power to promote and demote contained in Article XV?

The *only* other provision relating to promotions and demotions is Section 2, of Article III, the first sentence of which says:

"Promotions, transfers, demotions, layoffs and re-employment shall be made on the basis of seniority and ability."

It will be noted that this sentence definitely establishes the basis on which promotions, demotions, etc., will be made, that is on seniority and ability. This section further provides:

"Whenever it is deemed necessary to *deviate from seniority* it may be made the subject of a conference between the Workmen's Committee and the Management prior to the placement of the employee in the position. It is understood, however, that the decision of the Management in this regard shall be final."

Thus, it is only when the Company deems it necessary to *deviate from seniority* in promoting or demoting that consultations with the Workmen's Committee are contemplated. The contract clearly requires no consultation with respect to promotions, demotions and transfers automatically resulting from changes in hours of work or reduction or increases in forces, so long as there is no deviation from seniority in applying such promotions, demotions and transfers. Here the evidence shows without dispute that such demotions as automatically resulted from the adoption of the 48-hour week were uniformly applied in accordance with the approved seniority list.

So, on the second basic difference between the parties, that is, whether the

Company has the right, under the contract, to determine the hours an employee is to work, without entering into a supplemental agreement with the Union covering that subject, I hold that so long as such hours are in keeping with the law it has that right.

Sometimes, when parties are contracting, certain understandings are so obvious that it is not necessary formally to express them in the contract. This challenged right of the employer is one of them. It would have been just as useless to have put into this contract a provision that any employee dissatisfied with the hours of work required by the employer, or with any raise in hours of work, could quit for such reason, or for any other reason. He has that right, as fully without its being expressed, as if it were expressed.

Likewise the employer has the right, in the absence of a specific provision to the contrary, to fix the hours of work. The contract clearly contemplates that the authority to determine the hours an employee is to work, as well as his lay-off time, is with the Company. In the absence of a provision to the contrary this is the universal custom. The employer knows what his production must be, how urgent it is, etc. He also knows when lay-offs or even shut downs must be resorted to. This is not an employee's end of the business; it is for the Management. C. G. Conn, Ltd., v. National Labor Relations Board, 7 Cir., 108 F.2d 390, 399.

### IX. Validity of Arbitration Award.

Over its protest the Company has been required by a directive of the War Labor Board of the Eighth Region to submit to an arbitration of the Orr issue and the work week issue. The Board of Arbitration, by a majority vote, held against the Company and it seeks in this suit to set the award aside (a) because neither of the issues is an arbitrable matter under the terms of the contract, and (b) because the "relief" which the arbitrators undertook to provide is, in each instance, beyond the powers vested by the contract in arbitrators.

█ *(1) The Court's Function.* The arbitration was not in accordance with either the state or federal statute governing arbitrations. It was *under the contract,* and, therefore, was one at common law. The terms of the submission are the relevant portions of the contract, and those portions are appropriate for construction by a court of competent jurisdiction, just as are all other provisions of the contract. If the matters determined are not within the terms of the submission (i. e. within the arbitration provisions of the contract), or the arbitrators in their award go beyond the contemplation of the parties, as reflected in the contract, they obviously exceed their jurisdiction, and their award may be set aside in an appropriate proceeding.

In 3 Am.Juris. p. 868, sec. 41, it is said:

"Interpretation of arbitration agreements is ordinarily for the court. It is for the court, not the arbitrators, to decide whether the latter have exceeded their powers under the submission or have refused to exercise them, for since the submission is the foundation of the arbitrators' jurisdiction, their construction of it with respect to their own powers, unless clearly pursuant to its terms, is not conclusive."

Again:

"There is nothing peculiar in the rules of interpretation applied to arbitration agreements. As in the case of all agreements, the courts seek to give effect to the intent of the parties, as evidenced by the agreement itself, which will be liberally construed to that end."

In the early case of Halstead v. Seaman, 82 N.Y. 27, 37 Am.Rep. 536, it was said:

"The case must turn upon the correctness of the arbitrators' construction of the submission. On this point, the decision of the arbitrators is not conclusive. No such question was submitted to them. It is for the court to judge whether arbitrators have exceeded their powers, or refused to exercise them. The general rule that their decisions are not reviewable on the mere ground that they are erroneous, is applicable only to their decisions on matters submitted to them. The submission is the foundation of their jurisdiction, and they are not the exclusive judges of their own powers."

In the comparatively recent case of Lehigh Coal & Navigation Co. v. Central Railroad of New Jersey, D.C., 33 F.Supp. 362, 367, the District Judge of the Eastern District of Pennsylvania, quoted with approval the above quoted extract from American Jurisprudence, and held that a court has jurisdiction to determine whether the disputed question was arbitrable

under the contract, and that such a determination can be made prior to the arbitration, or when it is sought to set the award aside. He also quoted with approval from Sturges, Commercial Arbitrations and Awards, as follows:

"It is clear that the courts will review the question of what the parties agreed to arbitrate. when it is raised in any of the foregoing cases unless the parties in the given contract have agreed that the arbitrators shall finally decide their own jurisdiction. The courts do not readily infer such an agreement."

In B. Fernandez et al. v. Rickert Rice Mills, 119 F.2d 809, 814, 136 A.L.R. 351, the First Circuit Court of Appeals, in an opinion by Circuit Judge Mahoney, said:

"It is now well settled that the question of the construction of a contract to determine what questions the parties thereto agreed to submit to arbitration is one for the courts to decide and not for the arbitrators. * * * To allow the arbitrators conclusively to decide what questions were submitted to arbitration is to allow them finally to determine the extent of their own jurisdiction. If the parties intended that the arbitrators should have the power finally to decide what was to be submitted to them, there is no objection to their doing so, but the courts do not readily infer such an agreement."

Again:

"A party is never required to submit to arbitration any question which he has not agreed so to submit, and contracts providing for arbitration will be carefully construed in order not to force a party to submit to arbitration a question which he did not intend to be submitted."

Clearly it is necessary to examine the contract itself and determine whether the issues determined by the arbitrators are such as are under the provisions of the contract appropriate for arbitration.

▆▆▆ (2) The Arbitration Provisions of the Contract. Article XII of the contract, headed "Arbitration," is based on preliminary compliance with the provisions of Article XI, headed "Handling of Complaints." The complete provisions of both subdivisions of the contract are here quoted:

"Article XI. Handling of Complaints.

"The procedure herein provided shall be followed in the case of all employee complaints and grievances:

"1. The matter shall with reasonable promptness be presented by the employee to his foreman or other appropriate supervisor.

"2. Failing to reach a satisfactory understanding or settlement of the matter, the employee shall with reasonable promptness present the complaint or grievance to the Workmen's Committee, whose duty it shall be, upon investigation, to advise the employee whether or not the complaint shall be submitted to the Company.

"3. In the event the Workmen's Committee decides that the matter has merit, it shall be presented in writing to the Plant Superintendent within seven (7) days after presentation to the foreman or other appropriate supervisor.

"4. The Plant Superintendent shall fully investigate the matter and within seven (7) days shall advise the aggrieved employee and the Workmen's Committee in writing of the Company's position in regard to the complaint.

"5. If the Workmen's Committee considers that the Company's position is unsound, the matter will be discussed with the Plant Superintendent at their next called meeting.

"6. Should these means of reaching an agreement fail, the matter shall be settled in accordance with Article XII."

"Article XII. Arbitration.

"1. In the event it is impossible to reach a satisfactory understanding and settlement of any complaint or grievance by the procedure set forth in Article XI, the question in dispute shall be referred to a board of arbitrators. Such board shall be composed of three (3) members, one designated by the Workmen's Committee, one designated by the Company, and the third to be agreed upon by both the Workmen's Committee and the Company.

"2. If the two (2) members selected by the Workmen's Committee and the Company are unable to agree upon a third member within seven (7) days after their appointment, then a joint application for an impartial third arbitrator shall be made to the Director of Conciliation, U. S. Department of Labor, Washington, D. C.

"3. The decision of the majority of said board of arbitrators on the point or points at issue shall be final and binding upon both the Union and the Company.

"4. The cost of arbitration shall be borne equally by the Union and the Company."

It will be noted that arbitration is provided for only for any *complaint* or *grievance* as to which a satisfactory understanding or settlement is not reached by the procedure set forth in Article XI. The provisions of that Article are, therefore, controlling, and if neither of the issues involved in the arbitration is a complaint or grievance within the contemplation of that article, then neither of such issues was arbitrable.

I am firm in the view that Article XI, dealing with *complaints,* relates wholly to *individual* complaints and grievances, to the right of each individual to *the protection accorded him by the provisions of the contract.* It has no relation whatever to the possible desire of one or many employees for *changes in the contract.*

The machinery provided in Article XI for dealing with the *"employee* complaints and grievances" necessitates this construction. The very first paragraph provides that the matter shall be presented by the employee to his foreman. It is then provided that if he fails to reach a satisfactory understanding or settlement, he shall present it to the workmen's committee, who, upon investigation are to advise the employee whether the matter shall be submitted to the Company. If the Committee decides the matter has merit, it presents it to the Plant Superintendent within 7 days after the employee has brought the matter to the attention of his foreman. The Plant Superintendent then has 7 days in which to investigate the complaint and, in writing, advise the *aggrieved employee* and the Committee of the Company's position in regard to the *complaint.* If the Committee deems the Company's position unsound, the matter is ripe for discussion between it and the Plant Superintendent at the next meeting. It is only upon the exhaustion of all these methods of settling the *complaint* or *grievance* that the arbitration section of the contract can be brought into play.

These are all appropriate measures for securing to the individual employee his *rights under* the contract, but wholly inappropriate steps for obtaining *amendments to,* or *modifications of,* the contract—that would be a matter for collective bargaining.

The distinction is readily recognizable. Thus, the allowance of only three (instead of four) hours pay when called back to perform work after regular hours (Art. IV, Sec. 2) is a grievance or complaint, but a desire of one or all employees for a minimum of five hours pay would be a matter for collective bargaining. A failure to pay time and one-half for hours worked on New Year's Day (Art. V, Sec. 1) would be a proper basis for a complaint or grievance, but a desire of one or all employees for that rate of pay on San Jacinto Day or Washington's Birthday would be a matter for collective bargaining. If the Company shall attempt to charge an employee for utilities at one of the Company dwellings occupied by him (Art. VIII, Sec. 2), the charge would be an appropriate basis for complaint or grievance, but if all or any employee desired a general reduction in rentals, the matter would be one for negotiation. Many other examples could be cited reflecting the distinction between the protection through complaint machinery of the *rights of the individual employee,* granted by the contract, and the amendment of the contract through negotiation.

The contract between the parties was evidently made for the purpose of being followed. Doubtless in the course of bargaining each gave and each took. At any rate, it was entered into, and must be followed. I cannot believe that it was intended that if some or all of the employees became dissatisfied with some provision, the contract would be subject to amendment by a third party or three third parties acting as "arbitrators." Arbitration under an existing contract and negotiations for the amendment of a contract are entirely different functions. The Company cannot be forced, through intervention of arbitrators, into an amendment of the contract. If, therefore, the subject matter of the differences between the parties is fully covered by the contract, those differences are not within the complaint and grievance provisions of the contract, and are not arbitrable under the arbitration provisions; and if they are not arbitrable it is obvious that in attempting to arbitrate non-arbitrable matters the arbitrators have exceeded their jurisdiction, and their award is void.

■ *(3) Arbitrability of Orr's Seniority.* I have held that Orr's seniority standing at number 6 is required by the terms of the contract, and that the seniority list

prepared and posted in accordance with the terms of the contract became a part of that contract and cannot be disregarded. His seniority therefore is not, under the facts, an arbitrable matter.

**(4) Arbitrability of Length of Work Week.** I have also held that under the contract the Company has the right to determine the hours of work, subject only to its obligation to pay time and one-half for all time worked in excess of forty hours in any one week. Therefore, the length of the work week is not, under the facts, an arbitrable matter.

It is my holding that the purported award of the arbitrators is void both on the ground that the arbitrators attempted to exercise jurisdiction over non-arbitrable matters, and on the ground that the "relief" which they sought to grant was beyond their powers.

Inasmuch as the award is held void on the first ground, it is not necessary to dwell at length on the second ground. However, it is noted that the award requires that Orr's name be removed from the seniority list. This cannot be done without an amendment of the contract. It requires the execution by the parties of a supplemental agreement to the effect that any employee demoted to a lower paid classification as a result of the forty-eight hour week be allowed, after the war emergency, to return to the classification he formerly held. This is a matter of negotiation, not arbitration. It directs the Company to make certain reimbursements to employees affected by the Orr situation and the forty-eight hour week, but those directions are based on the judgment of the arbitrators as to what should be done rather than on contract requirements.

## X.   The Company is Not Estopped.

It cannot be contended that the Company is prevented by estoppel from contesting the validity of the arbitration award.

If it had voluntarily submitted the matters in dispute to arbitrators, or had agreed that the arbitrators themselves might determine their own jurisdiction, or interpret the terms of submission set out in the contract, and award such relief as they thought right, even though it involved an amendment of the contract, a different situation would be presented. Baltimore Transit Co. v. Flynn, supra. Here, the arbitration was participated in by the Company under great protest, and with full reservation of the right to take, in the future, such other steps as it might deem necessary in the protection of its rights. This fully appears from a consideration of the steps leading to the arbitration.

On November 20, 1942, the Workmen's Committee presented to the Company what they called General Complaint No. 1, in which it was contended that the Company had violated the contract in putting Orr back to work as Main Engineer and in adopting a 48-hour week. This Complaint also included a charge (later withdrawn and not here involved) of discrimination against Union men. On November 28th, the Company in a letter to the Union insisted that its action with respect to Orr was in strict accordance with the provisions of the contract and the seniority list posted thereunder, and that a determination of the length of the work week is purely a managerial function under Article XV of the contract.

On December 3, 1942, the Union made a demand for arbitration of their Complaint No. 1, to which demand the Company on December 11, 1942, replied that the Orr matter and the length of the work week were fully covered by the contract, and therefore not arbitrable.

Thereupon a representative of the U. S. Conciliation Service sought to compose the differences between the parties. To him the Company again interposed objections to arbitration based on the non-arbitrable nature of the matters involved.

Upon a certification by the Conciliator of his inability to bring the parties together, the Eighth Regional War Labor Board appointed a Tri-Partite Panel to consider the dispute.

On the merits of the dispute the members of that Panel were not in accord, the majority finding that the Company was wrong both as to Orr and as to the length of the work week, but the minority member, in a strong and forceful opinion, upheld the Company's contention that its action was in all things supported by the contract.

The minority member was, however, of the opinion that the Board's jurisdiction had not been properly invoked. He was of the view that the arbitration provisions of the contract were applicable and should be exhausted before the parties were au-

thorized to present their differences to the War Labor Board. He made clear his view that the Board could not, and should not if it could, rewrite the contract, and observed that if the board of arbitrators patently disregarded the plain provisions of the contract, entertained jurisdiction over the objections of the Company and disposed of the case contrary to the provisions of the contract, the aggrieved party would surely be entitled to appeal to the Board, and probably to the courts for relief. It was his recommendation that the Board decline to accept jurisdiction over the disputes on a merit basis, but that it exercise its general jurisdiction to the extent of instructing the parties to follow the provisions of their contract in the handling of the matter.

The Eighth Regional War Labor Board on June 9, 1943, issued what it called a "Directive Order," in which it adopted the minority recommendation of the dissenting member of the Tri-Partite Panel that the Board decline to accept jurisdiction over the disputes on a merit basis, but "Modifies such minority recommendation in that the Board directs the parties to forthwith proceed with arbitration of the issues in this case as provided for under the terms of the present collective bargaining agreement now in force and effect, such arbitration to be commenced not later than ten days from date of mailing of Directive Order in this case."

Thereupon each of the parties designated an arbitrator and the third arbitrator was agreed upon. The Company made clear to the board of arbitrators that it was entering into the arbitration under coercion, pointed out that the arbitrators had not been asked to compromise any part of the dispute or write into the existing contract any provisions or agreement not already contained therein; and stated that should the decision of the arbitrators fall outside the scope of the agreement, the Company might elect to take such further action as might be necessary to protect itself.

Thereafter, on October 20, 1943, a majority of the board of arbitrators entered the award which the Company seeks to set' aside in this proceeding.

There has never been a recognition by the Company that either the seniority of Orr or the right to determine the length of the work week is under the contract an arbitrable matter. On the contrary it has

consistently maintained its position that neither is arbitrable. Its participation in the arbitration was expressly stated to be under coercion, and with a reservation of all rights to attack the award if it went beyond the terms of the contract. It is not estopped.

Upon entry of the arbitration award, the Company was entitled to a judicial determination of its rights and the validity of the award in a court of competent jurisdiction. This court is an appropriate tribunal for that determination.

Counsel may submit for approval a decree prepared in accordance with this opinion.