**EAST BAY UNION OF MACHINISTS, LOCAL 1304, UNITED STEELWORK-ERS OF AMERICA, AFL–CIO, an un-incorporated association, United Steel-workers of America, AFL–CIO, an un-incorporated association, Plaintiffs,**

v.

**FIBREBOARD PAPER PRODUCTS COR-PORATION, a corporation, Defendant.**

**No. 41619.**

United States District Court
N. D. California.
June 4, 1968.

Darwin, Rosenthal & Leff, San Francisco, Cal., with Irwin Leff, San Francisco, Cal., appearing for plaintiffs.

Marion B. Plant and E. Judge Elderkin of the Brobeck, Phleger & Harrison firm, San Francisco, Cal., for defendant.

## MEMORANDUM OPINION: FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALBERT C. WOLLENBERG, District Judge.

This is an action for damages for breach of a collective bargaining agreement between the plaintiff Unions (both the Local Union and the International are plaintiffs; they will be referred to collectively as the "Union") and the defendant Fibreboard.[1] The damages were suffered by 53 members of the Union employed by Fibreboard up to July 31, 1959 and terminated on that date when Fibreboard contracted out the maintenance operations at its Emeryville plants.[2] The claim in the complaint rests on the Union's contention that the contract between the Union and Fibreboard continued in effect after July 31, 1959, up to the negotiations of a new contract in July, 1965, and the contract barred contracting out of Fibreboard's maintenance operations. This Court has jurisdiction pursuant to 29 U.S.C. § 185(a).

One of the main issues to be resolved is whether the contract was in effect at the time of the alleged breach. Plaintiffs claim that the contract was renew-

---

1. Section X of the agreement states, in part: "It is understood that all work coming under the jurisdiction of the East Bay Union of Machinists shall be performed by employees working under this Agreement."

2. Plaintiffs admit that back pay awards stemming from certain proceedings before the Nation Labor Relations Board would be deducted from the amount of claimed damages.

ed, while defendant contends that the contract terminated and thus it was free to contract out the work. Both parties rely upon the "witnesseth" clause of the contract in support of their contentions, which reads as follows:

## WITNESSETH:

This Agreement shall continue in full force and effect to and including July 31, 1959, and shall be considered renewed from year to year thereafter between the respective parties unless either party hereto shall give written notice to the other of its desire to change, modify, or cancel the same at least sixty (60) days prior to expiration.

Within fifteen (15) days after notice of reopening is given, the opening party shall submit a complete and full list of all proposed modifications. All other sections shall remain in full force and effect. Negotiations shall commence no later than forty-five (45) days prior to the anniversary date of the Agreement unless otherwise mutually changed.

The Union sent its notice of modification to the company on May 26, 1959, at least 60 days prior to the termination date of the contract.[3] Fibreboard replied to this letter on June 2, 1959, stating that it would contact the union at a later date regarding a meeting for the purpose of discussing modifications to the contract. The Union submitted its proposed modifications to Fibreboard on June 15, 1959, within the required time provided by the "witnesseth" clause. On July 29, 1959, Fibreboard told the Union that it

had made a decision to contract out its maintenance work effective August 1, 1959. The letter concluded: "In these circumstances, we are sure you will realize that negotiation of a new contract would be pointless. However, if you have any questions, we will be glad to discuss them with you."

Throughout meetings held between July 29 and July 31, the company took the position that it had a legal right to contract out the maintenance work. Effective August 1, 1959, it discharged certain members of the Union in accordance with its announced plan.

Plaintiffs contend that a notice of modification does not stop the contract from being automatically renewed as the first paragraph of the witnesseth clause seems to indicate. They rely on the second paragraph of the clause, in particular, the sentence which states that "all other terms shall remain in full force and effect," for the proposition that once a list of modifications is sent by the union to management, those terms not requested to be modified continue in effect after the termination date specified in the first paragraph of the contract. Those terms subject to modification are to be negotiated, and, if the parties fail to agree on the proposed modifications, they would utilize the arbitration procedures established in XXI of the agreement.[4] How else, ask plaintiffs can we give meaning to the "full force and effect" clause, since *all* the terms of the contract would *remain in effect*, in any event, until the termination date?

Plaintiffs' other argument is that the "witnesseth" clause in issue has been in-

---

3. The letter reads in part: "Pursuant to the provisions of the Labor Management Relations Act, 1947, you are hereby notified that the Union desires to modify as of August 1, 1959 the collective bargaining contract dated July 31, 1958, now in effect between the Company and the Union.

"The Union offers to meet with the company at such early time and suitable place as may be mutually convenient, for the purpose of negotiating a new contract."

4. Section XXI(b) reads: "Pending negotiations for settlement of grievances *or the Agreement*, there shall be no strike or lockout." [Emphasis supplied].

Section XXI(d) reads: "In case these efforts at adjustment fail, the subject in question shall be submitted to an impartial arbitrator mutually agreed upon by both parties to this Agreement whose decision shall be final and binding."

terpreted in a judicial decision as not barring automatic renewal once a notice of modification is sent and that decision operates as a collateral estoppel. See, Fibreboard Paper Products Corp. v. East Bay Union of Machinists, 227 Cal.App.2d 675, 39 Cal.Rptr. 64 (1964), infra; [hereinafter referred to as Fibreboard].

Defendant argues that the "witnesseth" clause can only be read to mean that once a notice of modification, as well as a notice of termination or cancellation, is given, the contract cannot be automatically renewed. A reading of the first paragraph of the clause supports this view. As to the "full force and effect" clause, so much relied upon by plaintiffs, defendant contends that it means only that those sections not requested to be modified "remain in full force and effect" from the time the list of modifications is furnished until the time of termination as specified in the contract. In reply to plaintiffs' argument regarding the collateral estoppel effect of the California District Court of Appeal decision in *Fibreboard*, defendant contends that the judgment was not a final one and cannot be used to preclude the raising of the present issues.

The *Fibreboard* case in the California courts arose out of the same events as are here in issue. When, on July 31, 1959, Fibreboard discharged the maintenance employees, the union established a picket line at the Emeryville plant. After securing temporary injunctive relief and a contempt order in the Superior Court, Fibreboard sued for compensatory and exemplary damages suffered as a result of the picketing. After a verdict was returned awarding Fibreboard both compensatory and punitive damages, the union appealed the case to the California District Court of Appeal.

The trial court, after receiving some evidence on the issue, had ruled that the contract in issue herein terminated as a matter of law as of August 1, 1959. On appeal, the union urged that if the contract did not terminate and Fibreboard's conduct in contracting out the mainte-

nance work could be considered a breach, then there would be evidence of provocation in order to mitigate the award of punitive damages. The District Court of Appeal agreed, and interpreted the contract as follows:

"In our opinion, the reasonable interpretation to be placed upon the entire clause is as follows: That unless either party gives a written notice to the other of its desire to cancel the contract at least 60 days prior to its expiration date, the contract is renewed for another year; that where a written notice of a desire to change or modify the contract is given 60 days prior to such expiration date, the provisions of the contract concerning which no change or modification is requested are to remain in effect while the parties negotiate the proposed modifications. We accordingly conclude that the trial court erroneously determined that the subject contract terminated as a matter of law pursuant to its own terms and conditions. *Whether the contract was in fact terminated or whether it was still in existence subject to modification were questions of fact for the jury requiring appropriate instructions.* Fibreboard, supra, 39 Cal.Rptr. at 95. [Emphasis supplied].

The Court rendered its judgment of reversal with directions to the trial court "to retry the issue of exemplary damages" against the union. *Fibreboard*, supra, 39 Cal.Rptr. at 100. A petition for hearing before the California Supreme Court was denied on August 5, 1964. No retrial was ever had, since the matter was settled by mutual agreement.

 It is clear that if the judgment of the District Court of Appeal be considered a final one, then all of the elements necessary to invoke the doctrine of collateral estoppel are present. The parties in the former litigation are the same parties present here. The issue decided in the state court was not dicta. The interpretation of the contract was an issue litigated before the District Court of Appeal as well as the trial

court, although no extrinsic evidence was ever before those respective courts. Hence, all the elements of collateral estoppel are present. See, Lawlor v. National Screen Service Corp., 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948); Cromwell v. County of Sac, 94 U.S. 351, 353, 24 L.Ed. 195 (1876). The only issue that this Court must consider is whether the judgment of the appellate Court was final, since finality is an essential predicate to collateral estoppel. American National Insurance Co. v. Yee Lim Shee, 104 F.2d 688, 692 (9th Cir. 1939), and cases collected in, 1B MOORE'S FEDERAL PRACTICE § 0.409 [1], at p. 1001 n. 5 (2d ed. 1965).

■ In determining whether the judgment of reversal with directions for a new trial was a final one, we are guided by the general principle enunciated in Restatement of Judgments (Section 41, comment *d*), which reads as follows:

"If the original judgment has been set aside or reversed and further proceedings are directed, such as a new trial, the rules of res judicata are not applicable until a new judgment is rendered."

■ Plaintiffs agree that the original judgment of the California Superior Court cannot operate as collateral estoppel since it was reversed. They argue that the judgment which establishes collateral estoppel is the judgment of the State District Court of Appeal in the *Fibreboard* case, which became final when a hearing was denied by the California Supreme Court. While the judgment may have become final when a hearing was denied for purposes of pursuing further state appellate court remedies, it is clear that the judgment was not final for the purpose of collateral estoppel. The reversal with directions for a new trial

placed the parties in the same position as if the action had never been tried, except that the opinion of the District Court of Appeal must be followed in the State Trial Court as the law of the case. Mears v. Superior Court, 186 Cal.App.2d 770, 9 Cal.Rptr. 113 (1961).

■ While there is California authority that an appellate decision can be res judicata, no cases can be found which would support plaintiffs' position as to the effect of a judgment of reversal with directions for a new trial. See, e. g., Overstreet v. County of Butte, 57 Cal.2d 504, 20 Cal.Rptr. 631, 370 P.2d 335 (1962); Department of Water & Power, etc. v. Inyo Chem. Co., 16 Cal.2d 744, 108 P.2d 410 (1940); Grable v. Grable, 180 Cal.App.2d 353, 4 Cal.Rptr. 353 (1960); Carter v. Superior Court, 96 Cal.App.2d 388, 215 P.2d 491 (1950); Phillips v. Patterson, 34 Cal.App.2d 481, 93 P.2d 807 (1939). Contra: Devens v. Goldberg, 96 Cal.App.2d 539, 215 P.2d 935 (1950). The California cases and statutes indicate that a judgment of reversal with directions for a new trial cannot be considered final for purposes of res judicata. See, Department of Water & Power, etc. v. Inyo Chem. Co., supra; Cowdery v. London & San Francisco Bank, 139 Cal. 298, 73 P. 196 (1903). See also, Cal.Code Civ.Proc., § 43 (1967 Amend.); Cal.Code Civ.Proc. § 956a.

■ The instant case serves as an example of why the District Court of Appeal judgment cannot be considered final for purposes of res judicata. From the opinion in *Fibreboard*, it is clear that the Court was *looking to* a final judgment rather than granting one, since it indicated that there were facts which would have to be submitted to the jury before a *final* judgment could be rendered.' Just what these facts were has been the subject of some discussion by the parties.[5] In any event, the law in Cali-

---

5. Plaintiffs assert that the only *fact* to be decided was whether its notice was one of modification or termination. While this may be a factual issue, the District Court of Appeal could have been referring to the question of timely notice, since from the facts recited in the opinion, the Court may have felt there was an issue as to when the union's notice was received by the company. *Fibreboard*, supra, 39 Cal.Rptr. at 91–92.

fornia seems to be in accord with law in other jurisdictions regarding the effect of a judgment of reversal with directions for a new trial. See, 1B MOORE'S FEDERAL PRACTICE § 0.416[2] at p. 2231 (2d Ed. 1965); Restatement of Judgments, § 41, comment *d*. In light of the authorities cited, the judgment of the District Court of Appeal in *Fibreboard* was not final for the purposes of collateral estoppel.

We next come to the question of the interpretation to be placed upon the "witnesseth clause." While both sides have argued that as a matter of law, the clause leads to only one interpretation, we are of the opinion that defendant's interpretation is the correct one. We agree with defendants that plaintiffs' interpretation would leave the parties with a skeletal contract after the termination date specified in the contract. In fact, plaintiffs' modifications with respect to the contract which was to terminate on August 1, 1959, dealt with wages, and other important contract provisions.

We cannot understand what the parties were to do after August 1, 1959 with respect to those terms. While plaintiffs have suggested that the terms upon which the parties would be unable to negotiate would become subject to the arbitration provision of the contract, we think that the "witnesseth" clause is the sole source to determine the rights and duties of the parties regarding the termination of the contract. The entire contract, including the arbitration clause, can still be given effect without interpreting the contract as plaintiff desires. There might be situations, during the existence of the contract, where the parties would be in disagreement over the meaning of the terms of the contract; accordingly, they would have to arbitrate the matter according to the arbitration section of the contract. This does not mean that when the parties are unable to agree as to the terms of a new contract, the old contract is to carry over until that dispute is arbitrated. It must be remembered that the parties, in the "witnesseth clause", referred to the agreement becoming *renewed* from year to year.

■■ To renew, in the present context, means to "begin again" or "continue in force" the old contract. WEBSTER'S INTERNATIONAL DICTIONARY, Unabridged, p. 2109 (2d ed. 1950). Once one of the parties has stated his desire to modify the *old* contract, that contract cannot obviously be "renewed", since there would in effect be a *different* or *new* contract. This is the clear meaning of the first paragraph of the "witnesseth clause."

The second paragraph, relied upon by plaintiffs, does not detract from the clear meaning of the first. All that the second paragraph adds are provisions governing the period during which negotiations are to take place once a notice of modification is timely sent. That period ends on the date of termination by force of the first paragraph. When the parties placed the "full force and effect" sentence between the sentence which governs the time for presenting a list of modifications and the sentence which governs the commencement of negotiations, they only intended to limit the *scope* of the proposed modifications prior to negotiations. This is clear from the evidence presented by defendants.

Mr. Thumman, director of industrial relations of Fibreboard from 1949 to the present, testified that the "witnesseth" clause was changed to something similar to its present wording during the negotiations preceding the 1951–1952 contract. He testified that the union had sent a notice of modification, following this with a list of proposed modifications. He further testified that when negotiations were commenced, the union's agenda contained two additional items other than what was submitted in the original list of proposed modifications. In the proposed modifications, the union desired clarification of the meaning of the then

existing "witnesseth" clause.[6] Thumman spoke to Mr. Immethun, the union representative, as to what he meant by "clarification". After several conversations, it was understood that when the contract was opened up for modification, the union would be prevented from opening up sections for modification other than those mentioned in its list of proposed modifications. Those sections not opened for modification were to remain "in effect".

Thumman also testified that he had a conversation with Mr. LaVerrell, a union representative, now deceased, just prior to the termination date of the 1951–1952 contract. The gist of the conversation was that as the termination date of the contract was growing close and as the next meeting between the union and company was set for a date after termination, LaVerell wanted a written extension of the contract past the next meeting date, since he felt that the contract would terminate as of July 31, 1952. An extension of time was thereupon put into writing by management.

Plaintiffs' evidence was that the parties continued their negotiations with respect to the 1957 agreement past the termination date without any objection by Fibreboard. They also rely on language contained in "witnesseth" clauses of other contracts to support its position.[7]

■ Plaintiffs have moved to strike the evidence offered by the Fibreboard and themselves, resting on their collateral estoppel argument and their interpretation of the contract. Defendant has moved to strike plaintiffs' evidence. We find that defendant's evidence is highly relevant and material in that it shows clearly what the intent of the parties was at a time prior to any dispute as to the meaning of the clause. Such evidence is admissible, especially to determine the meaning of a collective bargaining agreement through past acts and declarations of the parties thereto. Transportation-Communication Employees Union v. Union Pacific Ry. Co., 385 U.S. 157, 161, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966); Pekar v. Local Union 181, Internat'l Union of Brewery, etc., Wkrs., etc., 311 F.2d 628 (6th Cir.), cert. denied, 373 U.S. 912, 83 S.Ct. 1303, 10 L.Ed.2d 414 (1962). Accordingly, plaintiffs' motion to strike defendant's evidence will be denied. It would seem unnecessary to reach defendant's motion to strike plaintiffs' evidence, since plaintiffs have moved to strike their own evidence. Most of the evidence relied upon by plaintiff shows at most what the "parties *did* relative to the modifications or termination of the contract" and is thus equivocal and ir-

---

6. The "witnesseth" clause, then in effect, was contained in the 1949–1950 contract, which read:
"If any changes are desired in the hours, wages and working conditions established in this Agreement, sixty (60) days' notice prior to the expiration of this Agreement shall be given in writing by either employers or employees, parties of this Agreement.
"*Prior to the commencement of negotiations each party shall give to the other party written notice of the sections to be opened. All other sections will remain in full force and effect.*" [Emphasis supplied].

7. For instance, the 1955–57 agreement contained the following proviso to the first paragraph of the witnesseth clause:
"[P]rovided, however that upon at least sixty (60) days' written notice prior to August 1, *1956* the Agreement may be reopened for a discussion of *pensions only.* Such discussion, if not amicably settled by August 1, 1956, shall terminate this Agreement unless it is extended by mutual agreement." [Emphasis supplied].
Plaintiffs contend that if the agreement already was taken by the parties to mean automatic termination in the event of reopening, there was no need to insert the above-quoted proviso. It need only be pointed out, in answer, that the agreement was for *two* years, not one year; hence, the proviso was necessary to allow the parties to reopen the agreement after one year to discuss pensions only. As to other provisions, modification would have to wait another year. There would thus be a need to clarify the effect of reopening the issue of pensions during the first year.

relevant. *Fibreboard,* supra, 39 Cal. Rptr. at 94.

From our reading of the contract, and the evidence offered to show the intent of the parties at the time the "witnesseth" clause was clarified, the only interpretation that can be given to the agreement is that the "full force and effect" clause was inserted only to insure that after a list of modifications was presented, future negotiations would not be burdened with additional proposals. Hence, once a notice of modification is sent, as was the case here, the contract cannot be *renewed,* and if the parties cannot reach agreement on a new contract prior to the expiration date of the old contract, there is no contract in existence after July 31, 1959. It logically follows that defendant could not have breached the contract when it contracted out work since there was no contract in existence to breach.

Plaintiffs' final argument that the contract continued past the expiration date is based upon Fibreboard's refusal to negotiate during the closing days of the contract. Fibreboard's position during that time was that negotiations would be futile since it had decided to contract out the maintenance work. It is now urged by plaintiffs that this refusal to negotiate in good faith was a breach of the contract; that the union had the option to redress this breach or continue the contract; that it chose the latter course, which in effect continued the contract past the termination date.

Fibreboard's refusal to negotiate has been the subject of much litigation before the National Labor Relations Board, culminating in the United States Supreme Court decision of Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). There, the Court held that Fibreboard had a duty to bargain with the union respecting the contracting out of its maintenance work. It affirmed the determination by the Board that Fibreboard's refusal to bargain was in violation of the Act, thereby affirming the Board's order of reinstatement and award of back pay from the date of the Board's Supplemental Decision and Order.

The only problem with plaintiffs' argument is that by breaching the contract by failing to negotiate, Fibreboard gave plaintiffs the option of terminating the contract at that time or continuing it in effect until the termination date, a matter of a few days. We have held that the notice of modification prevented *renewal* of the contract, and once this notice was given, the contract ended as of August 1, 1959, whether or not Fibreboard negotiated with the Union prior to that date. Even if Fibreboard had negotiated during the closing days of the agreement, the contract would not have been renewed. If the parties had reached agreement, a *new* contract would have come into being; the *old* contract would not, or could not, have been renewed. If no agreement were reached after negotiations, the contract similarly would not be renewed for another year, unless the parties agreed to postpone the termination date, or unless Fibreboard waived its option to terminate, as was done in the past. By failing to negotiate, Fibreboard stands in no worse a position from the standpoint of the automatic termination provisions contained in the "witnesseth clause". Its failure to negotiate could not by its own force extend the contract into a new period.

Having decided that there was no contract in effect which could have been breached at the time that Fibreboard contracted out its maintenance work, there is no need to decide the other issues presented involving arbitration and waiver thereof.

Defendant is to have its costs of suit herein. This opinion is to constitute findings of fact, and conclusions of law. Defendant is to submit a form of judgment.