**KAUFMAN AND BROAD HOME SYSTEMS, INC., Plaintiff-Appellee,**

v.

**INTERNATIONAL BROTHERHOOD OF FIREMEN AND OILERS, AFL–CIO, Defendant-Appellant.**

**No. 77–2283.**

United States Court of Appeals, Fifth Circuit.

Dec. 5, 1979.

---

Clarence M. Mulholland, R. Jeffrey Bixler, Toledo, Ohio, Richard L. Stumm, Atlanta, Ga., for defendant-appellant.

Robert D. Hall, Jr., John-Edward Alley, Tampa, Fla., John M. Gayner, III, Brunswick, Ga., for plaintiff-appellee.

Before AINSWORTH, VANCE and ANDERSON, Circuit Judges.

AINSWORTH, Circuit Judge:

Kaufman and Broad Home Systems, Inc. ("Company") filed this suit for damages against International Brotherhood of Firemen and Oilers ("Union") under section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, alleging numerous violations of a collective bargaining agreement between them. After a nonjury trial, the district court held the Union liable to the Company in damages for two separate work stoppages, and the Union brought this appeal. We affirm the finding of liability as to the first work stoppage, but reverse as to the second work stoppage.

In October 1969 Kaufman and Broad, Inc., purchased the capital stock of Biltmore Mobile Homes, Inc., a mobile home manufacturing concern with facilities located in California, Georgia, and Idaho. Subsequently, the name of the company was changed to Kaufman and Broad Home Systems, Inc. Prior to its acquisition, Biltmore made two labor agreements with the International Brotherhood of Firemen and Oilers, the exclusive collective bargaining representative for the production and mainte- nance employees at Biltmore's Douglas, Georgia plant. The first agreement was entered into on November 9, 1966 and provided for a one-year duration. After conducting further negotiations during October 1967, the Company and Union entered into a new three-year agreement commencing November 13, 1967.

Both the 1966 and 1967 collective bargaining agreements contained a clause prohibiting either a strike by the Union or a lockout by the Company during the term of the agreement. The 1967 pact had a three-year term with a provision for year-to-year extensions. The duration clause of the contract, the interpretation of which is crucial to the disposition of this case, provided that:

> *Section 1.* This Agreement shall become effective as of November 13, 1967, and shall remain in effect until November 12, 1970, and from year to year thereafter with the provision that should either party desire to terminate this Agreement or to modify any part thereof, it shall notify the other party in writing no less than sixty (60) nor more than seventy-five (75) days prior to the end of said three-year period or the end of any subsequent one-year period that the party giving such notice desires either to terminate the Agreement at the end of such period or to negotiate amendments or changes of the terms or provisions thereof.

The above language is similar to that used in the 1966 agreement, although there are differences in the text which the Company asserts to be highly relevant to the clause's meaning.[1] There was no discussion of the

---

1. The 1966 duration clause provided that:

*ARTICLE XX*

*Duration of Agreement*

This Agreement shall become effective as of the 9th day of November, 1966, and shall remain in full force and effect until the 8th day of November, 1967, and each year thereafter unless written notice of termination or desired modification is given at least sixty (60) days prior to the expiration date by either of the parties hereto.

Should notice of termination or desired modification be given in the manner provided for above, the party desiring the same shall:
(1) Offer to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications.
(2) Notify the Federal Mediation and Conciliation Service within thirty (30) days after such notice of the existence of a dispute, and simultaneously therewith notify any State agency established to mediate

change in language during the negotiations conducted during October 1967.

The specific series of events giving rise to the present litigation are as follows. In January 1970 Union representatives met with the employees to discuss various grievances, and subsequently requested that the Company open the agreement for modifications. The Company refused relying on a provision in the agreement stating that matters not expressly covered were waived for the life of the agreement. In response to the Company's refusal to negotiate, the employees struck the plant on February 11, 1970 despite the no-strike provision in the contract. A Union representative arrived in Douglas on February 12, but the strike continued until February 16 when production was restored. It was undisputed that the collective bargaining agreement was in full force and effect during the February strike.

By letter dated September 4, 1970, the Union formally and timely notified the Company of its desire to open the agreement for modifications. The notice provided as follows:

> In accordance with the provisions of the current agreement between Local 283, International Brotherhood of Firemen and Oilers, AFL–CIO, and Biltmore Mobile Homes, Douglas, Georgia, we wish to open the contract for the purpose of changes and modifications.
>
> We stand ready to meet you at our earliest mutual convenience. Please contact us to set up a meeting date.

Negotiations ensued with the Union seeking increased wages and fringe benefits as well as modifications in the no-strike clause. The Company proposed some deletions in the agreement, but otherwise sought no changes. No agreement was reached on a new contract, and on November 13, the first day after the initial three-year term had expired, a strike occurred. The Union was fully aware of the strike action and provided financial support to the employees. The strike continued for approximately eight weeks until January 6, 1971 when the Company announced that it was permanently closing the Douglas, Georgia facility.

The Company's suit alleged four separate violations of the no-strike provision contained in the 1967 agreement.[2] The Union moved for partial summary judgment with respect to the first three incidents, contending that the Company's claims were barred by the four-year Georgia statute of limitations. The district judge denied the motion holding that the claims were timely and not barred under Georgia law. The district court, after a nonjury trial, found that the Union failed to take the steps necessary to end the February strike, and awarded damages of $2,563 to the Company against the Union. With respect to the November strike, the district court held that the Union's notice to modify was not sufficient to effect a termination of the agreement pursuant to the duration clause. Thus, the collective bargaining agreement was in full force and effect on November 13, 1970 and therefore the strike violated the no-strike provision of the agreement. Damages in favor of the Company were awarded against the Union in the amount of $241,674.

### The February Strike

The primary issue with respect to the February strike is whether the district

---

disputes within the State, provided no agreement has been reached by that time. (3) Continue in full force and effect without resorting to strike or lockout, all the terms and conditions of this Agreement for a period of sixty (60) days after such notice is given or until the expiration date of this Contract, whichever occurs later.

2. Besides the claims for the February 1970 and November 1970 strikes, the Company asserted claims for work stoppages occurring on November 13, 1969 and July 20, 1970. The district judge found that the Union was not liable

for those claims. The Company did not appeal these findings. The Company also asserted a pendant state claim alleging willful interference with the Company's business interests. The district court held that the state law claim was preempted by federal labor law in the absence of any proof that the Union's behavior was marked by violence or imminent threat to public order. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 729–32, 86 S.Ct. 1130, 1140–42, 16 L.Ed.2d 218 (1966); *Harnischfeger Corp. v. Sheet Metal Workers Int'l Ass'n*, 6 Cir., 1970, 436 F.2d 351, 355.

court applied the proper Georgia statute of limitations in holding that the Company's claims were timely asserted. It is conceded that under section 301 of the Labor-Management Act the timeliness of the suit is governed by state law. *International Union (UAW) v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966). The district court ruled that the six-year period provided in Georgia Code Ann. § 3–705 was applicable since it covered "actions upon promissory notes, bills of exchange, or other simple contracts in writing . . . ." The Union, however, asserts that Georgia Code Ann. § 3–711 should control with its four-year period of limitations for all claims "upon contracts express or implied, not hereinbefore provided for . . . ." Since the present suit was filed more than four years after the February 1970 strike, resolution of the limitations issue is dispositive of the claim as an initial matter. The district court, acknowledging that the question was one of first impression, found that section 3–711 was residual in nature, and that the more specific provisions of section 3–705 should control. The Union argues that a complex collective bargaining agreement cannot be considered a "simple contract," and that the six-year period is thus inapplicable. A Georgia federal district judge's interpretation of Georgia law is entitled to deference, and we agree with his determination of this issue.

The Union also claims that there was insufficient evidence of its involvement in the February strike, and that the computation of damages was clearly erroneous. Both contentions are without merit. The Union admits that the agreement was in full force and effect during the February strike, and that it had a contractual obligation to restore production. The evidence showed that even after arriving in Douglas, the Union representatives did not immediately order the employees back to work, but instead attempted to conduct negotiations with the Company concerning grievances. On the damages issue, it is undisputed that the Company suffered lost production as a result of the illegal strike and that it was forced to expend funds for legal services.

In light of the supporting documentary evidence produced, the district court's award was not clearly erroneous.

### The November Strike

In considering the November strike, the district court properly reasoned that the issue of liability turned upon interpretation of the duration clause. Initially, the district court ruled that the clause was ambiguous, and as a result heard extrinsic evidence of the parties' intent. The district court held that the agreement was not terminated by the Union's notice to modify. One reason given was the effect of certain language differences between the 1966 and 1967 agreements. The district court found that the changes made in the 1966 version created the ambiguity in the 1967 provision, and since the Union proposed the changes, the ambiguity should be construed against the Union as drafter. *See Alcoa Steamship Co. v. United States*, 338 U.S. 421, 424–25, 70 S.Ct. 190, 192, 94 L.Ed. 225 (1949); *Chevron Oil Co. v. E. D. Walton Construction Co.*, 5 Cir., 1975, 517 F.2d 1119, 1122. The district court also based its decision on the general federal labor policy favoring the preservation of uninterrupted business operations and the avoidance of industrial strife. *See Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 454, 77 S.Ct. 912, 916, 1 L.Ed.2d 972 (1957). Given this concern, the district court construed the duration clause as requiring strict compliance with the termination provision in order to terminate the agreement. Thus, the district court viewed the duration clause as creating two distinct types of notice with different functions. The court held that the notice to modify did not serve to terminate the agreement since that outcome was not expressly provided for in the duration clause.

The Union's primary ground for appeal is that the duration clause provided that either of two events, a notice to terminate or a notice to modify, prevented automatic extension of the agreement for an additional year past the November 12, 1970 expiration date. The Union asserts that a number

of decisions considering similar language support its contention. *See Local 350, United Association of Journeymen v. Slayden*, 91 LRRM 2272 (N.D.Cal., 1975); *Pullman, Inc. v. International Brotherhood of Boilermakers*, E.D.Pa., 1972, 354 F.Supp. 496; *East Bay Union of Machinists, Local 1304 v. Fibreboard Paper Products Corp.*, N.D.Cal., 1968, 285 F.Supp. 282, *aff'd* 9 Cir., 1970, 435 F.2d 556. While the Union argues that the agreement is clear on its face as to its duration, it also contends that the extrinsic evidence supports its position that the agreement was not in effect during the strike.

The Company, on the other hand, cites a number of cases which hold that notice to modify does not constitute termination. *See Motor Carriers Council of St. Louis, Inc. v. Local Union No. 600*, 8 Cir., 1973, 486 F.2d 650; *International Union of Operating Engineers v. Dahlem Construction Co.*, 6 Cir., 1951, 193 F.2d 470; *Texoma Natural Gas Co. v. Oil Workers International Union, Local No. 463*, N.D.Tex., 1943, 58 F.Supp. 132, *aff'd* 5 Cir., 1944, 146 F.2d 62, *cert. denied*, 324 U.S. 872, 65 S.Ct. 1017, 89 L.Ed. 1426 (1945); *United Steel Workers v. Shakespeare Co.*, W.D.Mich., 1949, 84 F.Supp. 267; *Mountain States Division No. 17 v. Mountain States Telephone & Telegraph Co.*, D.Colo., 1948, 81 F.Supp. 397. The Company asserts that these cases stand for the proposition that an effective notice of termination must be clear, explicit, and unequivocal. Furthermore, the Company places great weight on the changes in language incorporated into the 1967 agreement at the Union's request.

■ The duration clause in the instant contract provides for a year-to-year extension of the agreement "with the provision that" should either party wish to terminate or modify the agreement, notice must be given sixty days prior to the expiration date. It is not explicitly stated what effect either type of notice is to have. It is undisputed that notice to terminate inevitably operates to prevent extension. Thus, it is clear, at least for the purpose of notice to terminate, that the phrase "with the provision that" operates and is intended to act as a condition or limitation upon extension. Notice to terminate is not expressly given any extra weight or effect as compared to notice to modify; the structure of the clause is such that notice to terminate and notice to modify are functionally equivalent in the extension clause. As a result, the most logical and defensible interpretation of the duration clause is that either event, notice to modify or notice to terminate, serves as a condition or limitation on the extension of the agreement. We hold, therefore, that the duration clause is unambiguous and must be read so that notice to modify prevents automatic extension of the agreement in this case.

This construction is supported by the practical dynamics of labor-management relations. Collective bargaining agreements are not governed by the common-law principles controlling private contracts, but rather must be construed in light of industrial "practice, usage and custom pertaining to all such agreements." *Transportation-Communication Employees Union v. Union Pacific Railroad*, 385 U.S. 157, 160–61, 87 S.Ct. 369, 371, 17 L.Ed.2d 264 (1967). *See John Wiley & Sons v. Livingston*, 376 U.S. 543, 550, 84 S.Ct. 909, 914–15, 11 L.Ed.2d 898 (1964); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578–82, 80 S.Ct. 1347, 1351–53, 4 L.Ed.2d 1409 (1960). Given this awareness for the competing interests of labor and management, the Company's interpretation is untenable. Under the Company's view, the Union would have no recourse but to accept extension of the present agreement if the parties were unable to agree on modification. The Company would have the unilateral power to reject proposed changes without fear of Union reprisal for its recalcitrance. Indeed, there is nothing in the agreement as interpreted by the Company that would keep it from continuing year after year, thus forcing the Union to choose between termination of the entire agreement and ineffective negotiations. Interpreting the agreement in light of the realities of the bargaining process, it is absurd to construe the duration clause so as to render ineffective the

Union's contractual right to seek modifications.

In *Slayden, supra,* cited by the Union, the district court considered the effect of a notice to modify in light of the following duration clause:

SECTION 1. This agreement shall take effect June 1, 1973 and shall remain in effect up to and including June 1, 1974. It shall continue in effect from year to year thereafter, from June 1, 1974 each year unless changed or terminated in the way later provided herein.

. . . . .

SECTION 5. Either party desiring to change or terminate this Agreement must notify the other in writing at least sixty (60) days prior to the expiration date of this contract.

*Slayden, supra,* 91 LRRM at 2272. After receiving the union's notice to seek changes, the employer conducted negotiations, but they were not successful. After the expiration date, the employer hired nonunion workers. The union sued, claiming that under the duration clause the agreement was still in effect since it had not been changed due to lack of accord during the negotiations. The district court disagreed with this construction, and stated that:

It is inconceivable that either party, wishing to avoid a breakdown of labor-management relations would have intended that the contract continue in force unless efforts to change the contract were successful, or unless both sides wanted to terminate the contract. The side *not* desiring a change could refuse to agree, within the confines of the Labor-Management Relations Act's proscription against refusals to bargain. Each side could stand entrenched knowing the contract would continue as it was. The side desiring to alter the terms or conditions of the relationship would *never* have a prayer of success. Therefore we do not read the

language in Section 1 as requiring a completed alteration or termination of the contract before the expiration date would become effective. Notice of the desire of one party to change or terminate the contract is sufficient to cause the contract to expire.[3]

91 LRRM at 2274–75 (emphasis in original). Similarly, in *Fibreboard Paper,* the district court ruled as a matter of law that a collective bargaining agreement had expired sixty days after the union served a notice to modify. There, the duration clause provided that:

This Agreement shall continue in full force and effect to and including July 31, 1959, and shall be considered renewed from year to year thereafter between the respective parties unless either party hereto shall give written notice to the other of its desire to change, modify, or cancel the same at least sixty (60) days prior to expiration.

*Fibreboard Paper, supra,* 285 F.Supp. at 284. The district court held that "[o]nce one of the parties has stated his desire to modify the *old* contract, that contract cannot obviously be 'renewed,' since there would in effect be a *different* or *new* contract." *Fibreboard Paper, supra,* 285 F.Supp. at 287 (emphasis in original). *See Pullman, supra,* 354 F.Supp. at 498 ("the contract is to terminate even if the Union asks only for modification rather than explicitly for termination").

The Union's position is also supported by a decision of the National Labor Relations Board (NLRB) construing the effects of a notice to modify in a different context. In *Deluxe Metal Furniture Co.,* 121 NLRB 995 (1958), the NLRB considered the effect of a notice to modify in light of the following duration clause:

This agreement shall remain in full force and effect for the period from October 5,

---

**3.** In their supplemental brief filed after oral argument, the Company asserts that *Slayden* does not support the Union's position. To be sure, *Slayden's* clear holding was based upon a consideration of a separately signed document which established an exact date for expiration.

*Slayden, supra,* 91 LRRM at 2272–73. Thus, the language cited in text is properly classified as dicta. *Slayden's* consideration of the issue presented in this case, albeit dicta, is persuasive authority whose logic we choose to accept.

1955, to January 10, 1958, and shall thereafter be continued for one year periods unless notice of termination or modification in writing by registered mail is given by either party to this agreement.

*Deluxe Metal, supra,* 121 NLRB at 996. The union in *Deluxe Metal* served notice to modify. The NLRB was called upon to reconsider a number of principles dealing with the doctrine of contract bar. With respect to the notice to modify, the NLRB held:

> Any notice of a desire to negotiate changes in a contract received by the other party thereto immediately preceding the automatic renewal date provided for in the contract will prevent its renewal for contract bar purposes, despite provision or agreement for its continuation during negotiations, and regardless of the form of the notice.

*Deluxe Metal, supra,* 121 NLRB at 1002.

The Company's cited authorities are distinguishable. For example, in *Dahlem* a union went on strike following unsuccessful negotiations pursuant to a notice to modify. The duration clause provided:

> This agreement shall be in full force and effect until the first day of July 1949. Should either party hereto give written notice during the month of March, 1949, of a desire to modify any of the terms and provisions of this contract, negotiations will be entered into by the parties hereto for the renegotiation of this agreement. Should such notice of a desire to modify the terms of this agreement be given by either party to the other, then this agreement shall remain in full force and effect until modified by a new agreement resulting from the negotiations.

*Dahlem, supra,* 193 F.2d at 473. The Sixth Circuit held that notice to modify was "not a notice of termination and does not affect termination of the contract." *Dahlem, supra,* 193 F.2d at 475. This view is correct because of the fact that the agreement explicitly stated that the contract was to remain in effect until a new one was reached. *Cf. Motor Carriers, supra,* 486 F.2d at 652–53 (agreement stated rights of

parties should modification negotiations prove unsuccessful). The agreement in the present action contains no such statement about the effect of a notice to modify. Other cases cited by the Company are distinguishable because they involve agreements which did not mention the right of the union to seek modification as opposed to termination. *See Mountain States, supra,* 81 F.Supp. at 400. No decision relied on by the Company presents a case where the agreement provided for notice to modify and failed to detail the effect of such notice. If an agreement only provides for notice to terminate, it cannot reasonably be assumed that a notice to modify should have the same effect. *See Texoma, supra,* 58 F.Supp. at 138–40. Similarly, where the contract states the precise effect of a notice to modify, courts should enforce the provision as written.

The district court also relied on principles of general labor policy in reaching its decision. This reliance was misplaced. The district court's concern with industrial peace and uninterrupted business operations is, of course, proper. But this interest is not the only goal of federal policy. The Supreme Court has characterized the general scheme of the nation's labor policy as having the dual purpose of "[substituting] collective bargaining for economic warfare and [protecting] the right of employees to engage in concerted activities for their own benefit." *NLRB v. Lion Oil Co.,* 352 U.S. 282, 289, 77 S.Ct. 330, 334, 1 L.Ed.2d 331 (1957). In *Lion Oil,* the Court, construing section 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d), recognized that federal labor policy does not prohibit strikes in support of demands for modification since such a position "would discourage the development of long-term bargaining relationships." *Id.* The Court stated:

> Congress recognized a duty to bargain over modifications when the contract itself contemplates such bargaining. It would be anomalous for Congress to recognize such a duty and at the same time deprive the union of the strike threat which, together with "the occasional

strike itself, is the force depended upon to facilitate arriving at satisfactory settlements."

*Lion Oil, supra,* 352 U.S. at 290–91, 77 S.Ct. at 335 (footnote omitted). This concern for labor's interest in concerted activity supports the Union's interpretation of the agreement, and counterbalances the district court's focus on safeguarding industrial peace.

 Finally, even assuming *arguendo* that the agreement is ambiguous, the extrinsic evidence presented at trial supports the Union's view. Of particular significance is the fact that the Company's Industrial Relations Manager, upon receiving the Union's notice to modify, wrote on his daily calendar that he had received "contract cancellation notice." His calendar entry for November 12, 1970 was that the "contract expires, Douglas, Ga." During an unrelated arbitration hearing conducted during the pendency of the strike, the same Industrial Relations Manager testified that the contract had expired on November 12, so that at the time of that hearing there was no agreement between the parties. Furthermore, the Company took no legal action against the Union to restore production. It is a standard rule of contract interpretation that great weight should be accorded to the interpretation placed on ambiguous language by the parties themselves as revealed through their statements and actions. *See, e. g., Esso International, Inc. v. S.S Captain John,* 5 Cir., 1971, 443 F.2d 1144, 1151; *Acheson v. Falstaff Brewing Corp.,* 9 Cir., 1975, 523 F.2d 1327, 1330. In light of the largely uncontradicted evidence that the Company believed the contract to have expired, the district court erred in not finding that the extrinsic evidence supported the Union's position.

In summary, we hold that the duration clause is unambiguous and provides that notice to modify prevents automatic extension of the collective bargaining agreement. Moreover, neither the extrinsic evidence presented at trial nor the general concerns of federal labor policy supports a contrary result.

The decision of the district court is

AFFIRMED IN PART, REVERSED IN PART.