781 F.2d 685
 121 L.R.R.M. (BNA) 2837, 104 Lab.Cas. P 11,854
 INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE
WORKERS, DISTRICT LODGE NO. 94, LOCAL LODGE NO.
1484, Plaintiff-Appellee,
v.
INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION, LOCAL
13, Defendant-Appellant,
and
Pacific Maritime Association; California United Terminals;
Long Beach Container Terminal, Inc., and
International Longshoremen's and
Warehousemen's Union,
Applicants for
Intervention-
Appellants.
 Nos. 84-6544, 84-6575 to 84-6577 and 84-6604.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 9, 1985.
Decided Jan. 23, 1986.
 
 William H. Carder, Leonard & Carder, San Francisco, Cal., Herbert M. Ansell, Los Angeles, Cal., George Shibley, Long Beach, Cal., for plaintiff-appellee.
 Jan Eakins, Dennis A. Gladwell, Gibson, Dunn, & Crutcher, Newport Beach, Cal., Deborah Reid Kelly, Long Beach, Cal., David Figcass, Paul A. Dezurick, San Francisco, Cal., for defendant-appellant.
 Appeal from the United States District Court for the Central District of California.
 Before ANDERSON and TANG, Circuit Judges, and SOLOMON, District Judge*
 J. BLAINE ANDERSON, Circuit Judge:
 
 
 1
 The International Association of Machinists and Aerospace Workers, District Lodge # 94, Local Lodge # 1484 ("IAM") brought this action against the International Longshoremen's and Warehousemen's Union, Local # 13 ("LOCAL 13"), alleging that LOCAL 13 was in breach of a jurisdictional agreement between the two locals. The district court agreed with IAM and issued a permanent injunction prohibiting both parties and "all persons acting in concert with any of them" from violating any term of the jurisdictional agreement. Shortly after the trial, the Pacific Maritime Association ("PMA"), the International Longshoremen's and Warehousemen's Union ("ILWU"), California United Terminals ("CUT"), and Long Beach Container Terminal, Inc. ("LBCT") moved to intervene, but the district court denied their request.
 
 
 2
 LOCAL 13 now appeals the grant of injunctive relief and is joined by PMA, ILWU, CUT and LBCT in appealing the denial of intervention. We reverse and remand.
 
 BACKGROUND
 
 3
 This dispute arises out of the fact that IAM and LOCAL 13 are affiliates of different international unions and represent different workers in the Los Angeles-Long Beach port area. Historically, longshoremen represented by LOCAL 13 performed the loading and unloading of ships, using equipment such as wire slings, rope nets, barrels, and pallet boards; which equipment they also repaired and maintained. Machinists represented by IAM were responsible for the repair and maintenance of mechanical cargo handling equipment such as trucks, tractors, lift trucks and mobile cranes.
 
 
 4
 In 1951, to avoid a potential jurisdictional clash, LOCAL 13 and IAM entered into a written agreement in which they set forth their jurisdictional boundaries. The agreement, to which LOCAL 13 and IAM were the only parties, purported to set out the division of work on the docks that had traditionally been maintained. The two locals, working together, attempted to secure cooperation, compliance and recognition of the agreement on the part of employers in the area. When work assignment disputes arose between longshoremen and machinists, the locals generally attempted to resolve the problems on an informal basis, as contemplated in the agreement.
 
 
 5
 The arrival of the "container" on the longshores of the United States around 1960 revolutionized the shipping industry, and with it the traditional work assignments of many longshoremen and machinists.
 
 
 6
 "Containers are large, reusable metal receptacles, ranging in length from 20 to 40 feet and capable of carrying upwards of 30,000 pounds of freight, which can be moved on and off an ocean vessel unopened. Container ships are specially designed and constructed to carry the containers, which are affixed to the hold. A container can also be attached to a truck chassis and transported intact to and from the pier like a conventional trailer."
 
 
 7
 NLRB v. International Longshoremen's Association, 447 U.S. 490, 494, 100 S.Ct. 2305, 2308, 65 L.Ed.2d 289, 296 (1980). From the standpoint of dock-side labor, the most significant change created by the containerization of the industry was the drastic reduction in the amount of on-pier work involving cargo handling. The new technology largely eliminated the traditional piece-by-piece loading and unloading of cargo. In its place emerged a new need for handling, maintaining and repairing the containers and their related equipment.
 
 
 8
 The reaction to the new technology by longshoremen in the ports of the United States was diverse.[1] In the Los Angeles ports, LOCAL 13 made no initial move to claim the work of maintaining and repairing the containers and related equipment. Rather, a general practice evolved throughout the 1960's for the distribution of work assignments. By the early 1970's, the two locals felt a need to memorialize that general practice. The result was a new jurisdictional agreement, between IAM and LOCAL 13, effective on January 24, 1973. This agreement was the first between the two locals to specifically provide for the handling of containers. The agreement gave LOCAL 13, among other things, jurisdiction over the rough cleaning and temporary patching of containers, and IAM jurisdiction over the steaming and repairing of containers and the work of container and trailer road checking. The agreement made no provision for settlement or arbitration of disputes. The agreement did not specify a termination date. Instead, the agreement provided that it "shall continue in full force and effect until either party gives written notice to the other party of a desire to amend or modify...."
 
 
 9
 ILWU is a labor organization which represents longshoremen employed in ports on the Pacific Coast, of which LOCAL 13 is an affiliate. PMA is an association of Pacific Coast employers engaged in shipping, stevedoring, and marine terminal operations. A major function performed by PMA is negotiating and entering into collective bargaining agreements on behalf of its member-employers with various unions. At all times relevant to this action, PMA and ILWU have been parties to a series of collective bargaining agreements known as the Pacific Coast Longshore and Clerks' Agreement ("PCLCA"), which covers a single coastwide bargaining unit consisting of all longshoremen and marine clerks employed by PMA member-employers. ILWU is certified as the exclusive bargaining agent for this unit.
 
 
 10
 On July 1, 1978, a re-executed and amended PCLCA went into effect between PMA, on behalf of its member-employers, and ILWU, on behalf of itself and its affiliate locals. The 1978 PCLCA contained the following new provisions:
 
 
 11
 1.7 This Contract Document shall apply to the maintenance and repair of containers of any kind and of chassis, and the movement incidental to such maintenance and repair. (See Section 1.8.)
 
 
 12
 1.71 This Contract Document shall apply to the maintenance and repair of all stevedore cargo handling equipment. (See Section 1.8.)
 
 
 13
 1.8 Any type of work assigned herein in Sections 1.43, 1.44, 1.6, 1.7 and 1.71 to longshoremen that was done by nonlongshore employees of an employer or by subcontractor pursuant to past practice that was followed as of July 1, 1978, may continue to be done by nonlongshore employees of that employer or by subcontractor at the option of said employer.
 
 
 14
 1.81 An employer in a port covered by this Contract Document who joins the Association subsequent to the execution hereof and who is not a party to any conflicting longshore agreement becomes subject to this Contract Document.
 
 
 15
 Pursuant to these provisions, LOCAL 13 members began performing work that was delegated to IAM under the 1973 jurisdictional agreement.
 
 
 16
 Counsel for IAM responded to this situation by requesting that LOCAL 13 cease and desist from taking any further action in clear violation of the 1973 agreement. Counsel for LOCAL 13 replied on August 30, 1979, with a letter stating inter alia:
 
 
 17
 To the extent that your client's claim that the agreement covers any of the work above referred to, LOCAL 13 pursuant to its rights so to do ... hereby amends and modifies the agreement to exclude therefrom any of the above mentioned work.
 
 
 18
 Shortly thereafter, IAM filed this action for damages and injunctive relief for breach of the 1973 jurisdictional agreement. LOCAL 13 and PMA were named as defendants. On May 29, 1981, the district court denied IAM's motion to amend its complaint to add ILWU as a defendant. On July 11, 1983, IAM and PMA stipulated to dismiss PMA from the action.
 
 
 19
 The action between IAM and LOCAL 13 was tried on October 29-31, 1984. At its conclusion, the district court announced that it intended to grant a permanent injunction requiring the parties to specifically perform the 1973 jurisdictional agreement. ILWU, PMA, CUT and LBCT immediately moved to intervene in the action. The district court denied these motions and entered the judgment. CUT and LBCT are both member-employers of PMA with no previous ties to the IAM. Thus, both were bound by the 1978 PCLCA to employ LOCAL 13 members to perform the specified work.[2]
 
 ANALYSIS
 I. Subject Matter Jurisdiction
 
 20
 Section 301(a) of the Labor Management Relations Act, 29 U.S.C. Sec. 185(a), provides that the district court has jurisdiction to consider "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations ..." (emphasis added). LOCAL 13 argues that the district court did not have jurisdiction to enforce the 1973 agreement because no employers were parties to that agreement and section 301(a) only covers agreements in which affected employers are parties or have consented to be bound by the terms. We disagree.
 
 
 21
 The plain language of section 301(a) manifests an intent to cover contracts entered into by two unions alone. We see no logical reason to give section 301(a) the limited reading suggested by LOCAL 13. Contract disputes between two or more different unions have the potential for creating industrial strife and disruption of the normal flow of commerce just as do contract disputes between a union and an employer. The purpose and policy of the Act would not be fully realized if disputes between unions were excluded from coverage.
 
 
 22
 The Supreme Court has noted that a purpose of the Act was to make unions "legally accountable for agreements into which they entered among themselves, an objective that itself would further stability among labor organizations." Plumbers & Pipefitters v. Local 334, 452 U.S. 615, 624, 101 S.Ct. 2546, 2551, 69 L.Ed.2d 280, 288 (1981). In that case, the Court approved jurisdiction under section 301(a) for consideration of an intra-union dispute between a local affiliate and its parent international. No employers were involved. Similarly, the purpose of the Act is best served by including inter-union suits in the coverage of section 301(a). Therefore, we hold that the district court had jurisdiction to consider the dispute between LOCAL 13 and IAM concerning the 1973 jurisdictional agreement.
 
 II. The Injunction
 
 23
 Few arenas in our domestic society have a history as dotted with unrest and disruption as the arena of labor relations. When it occurs, labor unrest affects many lives. Most directly affected are those people and organizations involved in a specific conflict. Less direct, but equally important, are the effects on the general public caused by disruption of the free flow of commerce. Because an innate potential for such disruption is constantly present in the ever-changing world of labor relations, the most basic and most important purpose behind the enactment of this nation's labor laws has always been the achievement of stability and harmony. See Seymour v. Hull & Moreland Engineering, 605 F.2d 1105, 1109 (9th Cir.1979). It was in furtherance of this basic goal that the district court issued the injunction in this case. For example, in its order the court said:
 
 
 24
 [T]he viability of the January 24, 1973 jurisdictional accord [ ] directly effects [sic] the free flow of commerce through the harbors of Los Angeles, Wilmington, San Pedro and Long Beach. In this regard, the jurisdictional agreement--designed to avoid industrial strife and discord--is in accordance with national policy and entitled to the judicial protection afforded by Section 301(a) 29 U.S.C. Sec. 185(a) of the Act. The collective effort by competing trade unions to resolve historic and volatile jurisdictional problems--such as is characteristic in the harbor--through means of peaceful agreements should be encouraged and is entitled to judicial protection and enforcement.
 
 
 25
 (Excerpt of Record at 207).
 
 
 26
 The court, before it concluded that specific performance of the 1973 agreement was necessary, discussed the validity of the agreement. It found the agreement was in full force and effect, unmodified and unterminated. Further, the court found that, despite occasional violations by both LOCAL 13 and IAM, both were in substantial compliance with the agreement. LOCAL 13 attacks these findings on many grounds. Assuming arguendo that the district court is correct in its findings on the validity of the 1973 jurisdictional agreement, we must nevertheless reverse the injunction for other reasons.
 
 
 27
 In order to carry out our national labor policy, we must not look at the 1973 jurisdictional agreement in a vacuum. We must carefully consider the potential effect an order of specific performance will have on other persons and organizations with interrelated interests. The best available example is provided by the facts of this case.
 
 
 28
 If viewed entirely alone, the 1973 jurisdictional agreement, along with its predecessor agreements dating back to 1951, was indeed a commendable effort by two local unions to head off potential problems through reasoned and peaceful compromise. LOCAL 13 and IAM weren't alone in the industry, however, and the jurisdictional agreements between the two did not solve all problems. The biggest snag in the smooth operation of this agreement was the fact that no employers were parties to the agreement and, therefore, none were bound to its terms. Any particular employer was left free to hire in contravention of the agreement. Theoretically, LOCAL 13 members were forbidden by the jurisdictional agreement from accepting work assignments within the jurisdiction of the IAM, and visa versa. Therefore, if a particular employer chose to assign a container steaming job (which is allocated to IAM under the 1973 agreement) to a LOCAL 13 member, the LOCAL 13 member should not have accepted that assignment. The employer would then be left with the alternative of assigning the task to a non-LOCAL 13 member, most logically from IAM.
 
 
 29
 The problem with this scenario is that employers enter into contracts as well. The employers in this case, negotiating as a coastwide unit, executed a collective bargaining agreement (PCLCA) with the certified bargaining representative for longshoremen on the Pacific Coast. Before 1978, there was no direct conflict between the PCLCA and the 1973 jurisdictional agreement. As we noted earlier, however, the 1978 amended PCLCA bound certain PMA member-employers to hire longshoremen for the specified jobs.[3] Thus, in the ports of Los Angeles, these PMA member-employers are bound to assign to LOCAL 13 members jobs which are within the province of IAM under the 1973 agreement. As a consequence, if the terms of both the PCLCA and the 1973 jurisdictional agreement are followed, PMA member-employers must assign the jobs in question to LOCAL 13 members and LOCAL 13 members cannot accept those assignments. In fact, the district court's injunction can be read to forbid PMA member-employers, under the threat of being held in contempt of court,[4] from honoring their own contract, the PCLCA.
 
 
 30
 The resulting dilemma, therefore, encompasses far more than the interpretation and enforcement of the 1973 jurisdictional agreement. The potential for strife is much greater. We reject IAM's contention that only IAM and LOCAL 13 are impacted by the injunction. It simply is not accurate. Even if the injunction can be read to apply only to IAM and LOCAL 13, the PMA member-employers are still deprived of the workers they have independently agreed to hire, because LOCAL 13 members would be enjoined from accepting the jobs. This amounts to a clear impact.
 
 
 31
 To resolve this conflict, we must turn again to the purposes behind the labor laws. The federal courts are authorized by section 301 of the Act to develop a federal common law "fashion[ed] from the policy of our national labor laws." Hendricks v. Airline Pilots Ass'n Intern., 696 F.2d 673, 676 (9th Cir.1983) (quoting Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972, 980 (1957)).
 
 
 32
 "Where, as here, no express statutory provision is applicable, the problem 'will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy.' "
 
 
 33
 Id. (quoting Lincoln Mills, 353 U.S. at 457, 77 S.Ct. at 918, 1 L.Ed.2d at 981). See also Toyota Landscape v. Bldg. Material & Dump Truck, 726 F.2d 525, 527-528 (9th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 104, 83 L.Ed.2d 49 (1984).
 
 
 34
 In our opinion, national labor policy dictates that local jurisdictional contracts, such as the 1973 agreement here, are secondary to bona fide, industry-wide collective bargaining agreements, and when in conflict the jurisdictional contract must give way. We have recognized that a bona fide collective bargaining agreement is more than a mechanism of private agreement. Rather, it is an instrument of government. Toyota Landscape, 726 F.2d at 529; Hendricks, 696 F.2d at 676. Under the labor relations framework adopted by Congress, employees have the freedom to choose their exclusive bargaining agent. Toyota Landscape, 726 F.2d at 529. The employer has a duty to bargain with this chosen representative and only this representative. Whisper Soft Mills, Inc. v. NLRB, 754 F.2d 1381, 1385 (9th Cir.1985). It is largely through this exclusive representation requirement that the policy of the labor laws "strive to bring stability to the process by which labor and management resolve their differences." Whisper Soft, 754 F.2d at 1385. Only by encouraging the collective bargaining relationship to be a continuing relationship of permanent conference and negotiation--which in turn will aid in establishing consistency, confidence and trust in the relationship--can the goal of stability in this process be realized.
 
 
 35
 To permit individual members or segments of the bargaining unit to unilaterally alter the agreements reached through the bargaining process would result in serious consequences to the labor relations framework. For example, the district court's injunction in this case could cause immediate harm to neutral employers through the loss of experienced workers. It could also raise the threat of a crippling ILWU strike if employers resorted to hiring nonlongshoremen. Most devastating from the standpoint of labor relations stability, however, is the injunction's potential effect on future bargaining between PMA and ILWU, for it would permit locals to execute agreements which conflict with those entered into by the certified bargaining agent. Therefore, the injunction ordering the specific performance of the 1973 jurisdictional agreement cannot stand.
 
 
 36
 We are mindful of the fact that PMA and ILWU undoubtedly were fully aware of the existence of the jurisdictional agreement between IAM and LOCAL 13 at the time the 1978 PCLCA was executed. We also are aware that the 1973 jurisdictional agreement was prior in time to the 1978 PCLCA. Neither reality alters our decision. PMA and ILWU are still the bargaining agents with the authority to execute working agreements for the unit, and neither PMA nor ILWU were parties to the 1973 jurisdictional agreement.
 
 
 37
 By our holding today, we do not intend to convey that local unions cannot enter into valid and binding contracts. The fact that ILWU has the power to enter into contracts on behalf of LOCAL 13 does not mean that LOCAL 13 has no power to bind itself through contract. There are many subjects within the governance of local unions which are amenable to contract resolution. And, if a local union breaches a contract, like any other contractor, it must remedy that breach. Our holding is that the remedy in the circumstances at bar cannot take the form of injunctive relief.
 
 
 38
 It may well be that no remedy is appropriate, or at least capable of calculation, in this case. As noted above, the agreement states that it "shall continue in full force and effect until either party gives written notice to the other party of a desire to amend or modify...." The district court interpreted this clause as setting out an indefinite contract that could only be changed or terminated through mutual agreement of the parties. In the district court's words, this perpetual nature was intended "as a means of resolving jurisdictional disputes, and insuring cooperation, peace and a continuation of work without strife...." (Excerpt of Record at 198).
 
 
 39
 The plain language of the clause, however, does not square with the district court's interpretation. A plain reading clearly provides that the agreement will cease to be in effect when one party notifies the other of a desire to amend or modify. Little could be added to make that language more straightforward. Furthermore, notice of a desire to modify has been held to properly terminate a contract. See Seymour v. Coughlin Co., 609 F.2d 346, 350-351 (9th Cir.1979) (approving the use of notice of modification in terminating contract in East Bay Union of Machinists, Local 1304 v. Fibreboard Paper Prods. Corp., 285 F.Supp. 282, 287 (N.D.Cal.1968)).
 
 
 40
 Furthermore, locking the parties into an indefinite contract is fundamentally inconsistent with the goal of resolving jurisdictional disputes through cooperation. LOCAL 13 "would have no recourse but to accept extension of the present agreement if the parties were unable to agree on modification." Kaufman and Broad Home Systems, Inc. v. International Brotherhood of Firemen, 607 F.2d 1104, 1109 (5th Cir.1979).
 
 
 41
 " 'It is inconceivable that either party, wishing to avoid a breakdown of [bargaining] relations would have intended that the contract continue in force unless efforts to change the contract were successful, or unless both sides wanted to terminate the contract. The side not desiring a change could refuse to agree ... Each side could stand entrenched knowing the contract would continue as it was. The side desiring to alter the terms or conditions of the relationship would never have a prayer of success.' "
 
 
 42
 Id. (citing Local 350, United Association of Journeyman v. Slayden, 91 LRRM 2272, 2274-2275 (N.D.Cal.1975)) (emphasis in original). Such an interpretation would aid little in "insuring cooperation, peace and a continuation of work without strife." Instead, it would create havoc, particularly in light of the constantly changing nature of the labor industry. Jurisdictional disputes would be solved only through court order. This could not have been the intent of the parties when drafting the plain language of the clause. In our opinion, therefore, the only plausible conclusion is that the 1973 agreement was terminated when LOCAL 13 gave notice to IAM in the August 30, 1979 letter.
 
 
 43
 Until this August 30, 1979 termination, however, the jurisdictional agreement was still effective. To the extent that LOCAL 13 members accepted work assignments allocated to IAM under the jurisdictional agreement up to that time, LOCAL 13 was in breach of the contract. The district court's responsibility on remand is to determine to what extent, if any, LOCAL 13 breached its contract with IAM before it was terminated on August 30, 1979. Further, if a breach is found, the district court should determine whether relief to IAM in the form of damages is appropriate and capable of calculation.
 
 
 44
 Accordingly, the judgment is REVERSED and this case is REMANDED to the district court for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Gus J. Solomon, Senior United States District Judge, District of Oregon, sitting by designation
 
 
 [1]
 See Ross, Waterfront Labor Response to Technological Change: A Tale of Two Unions, 21 Lab.L.J. 397 (1970)
 
 
 [2]
 The National Labor Relations Board has held, in a case involving many of the same parties present at bar, that sections 1.7, 1.71 and 1.8 of the 1978 PCLCA are not violative of section 8(e) of the National Labor Relations Act, 29 U.S.C. Sec. 158(e). Pacific Maritime Association, 256 N.L.R.B. 769 (1981). Although not directly on point to the instant action, the NLRB decision (and attached opinion of the Administrative Law Judge) clearly illustrates the binding effect of the 1978 PCLCA upon PMA member-employers
 
 
 [3]
 As set out above, sections 1.8 and 1.81 of the 1978 PCLCA provide that longshoremen shall be assigned the described work by all PMA member-employers who either used longshoremen before the 1978 PCLCA or who joined the PMA after execution of the 1978 PCLCA
 
 
 [4]
 The district court appeared ready to enforce the injunction, as evidenced by the following exchange:
 THE COURT: ... I'm going to go back to the agreement and order it enforced against both sides, and anybody that violates it will be in contempt of court. And there will be, if necessary, a jail sentence and fine.
 MR. SHIBLEY: Your Honor, may I respectfully point out to you neither PMA nor the International are parties to this, therefore, how can any injunction against Local 13 be enforced against PMA?
 THE COURT: But it's because it's another contract, and the case law is clear on it, that's how. The case law is clear it can be enforced, and so we will do it under the LMRA....
 (Reporter's Transcript, Volume VII, pages 10-11).